**PALMER et al. v. UNITED STATES et al.**
**Civ. No. 3816–47.**

District Court of the United States for the District of Columbia.

Nov. 20, 1947.

H. D. Boynton, of New Haven, Conn., G. H. Muckley and Stanfield Johnson, both of Washington, D. C., for complainants.

Robert E. Quirk, of Washington, D. C., for all intervening complainants.

J. Stanley Payne and Daniel W. Knowlton, both of Washington, D. C., for the Interstate Commerce Commission.

Edward J. Hickey, Jr., of Washington, D. C., for the U. S.

R. S. Outlaw and S. R. Brittingham, Jr., both of Chicago, Ill., Andrew C. Scott, of Chicago, Ill., and Lawrence Cake, of Washington, D. C., for intervening defendants Atchison, T. & S. F. Ry. Co. and others.

W. Carroll Hunter, James K. Knudson and Henry A. Cockrum, all of Washington, D. C., for Secretary of Agriculture.

Francis A. Silver and Harvard R. Osmond, both of Washington, D. C., for Director of Defense Transportation.

Glen A. Wilkinson and Ernest L. Wilkinson, both of Washington, D. C., for National Agricultural Cooperative Transportation Committee.

Before WILBUR K. MILLER and PRETTYMAN, Associate Justices, United States Court of Appeals for the District of Columbia, and LETTS, Associate Justice, District Court of the United States for the District of Columbia.

PRETTYMAN, Associate Justice.

This is a civil action brought by certain railroads to enjoin and set aside an order of the Interstate Commerce Commission entered on July 25, 1947, in a proceeding captioned "Increased Per Diem Charge on Freight Cars". The Secretary of Agriculture, the Director of the Office of Defense Transportation (whom we shall call simply the Director), the National Agricultural Cooperative Transportation Committee, and certain railroads, some as plaintiffs and some as defendants, have intervened.

On August 29, 1946, the Director wrote the Commission concerning shortages in cars available for the movement of freight, the implications of which, he said, were such as to endanger the Government's reconversion program and to affect adversely the welfare of the country at large. He said that he had recommended to the Reconstruction Finance Corporation the financing of the construction of 50,000 new

box cars for the railroads, but that such cars would not be available until some time during 1947, and that other measures to increase the available cars during the emergency should be considered. Further, he said that measures already taken were operating to curb the improvident use of cars by shippers and receivers, but that the other phase of the problem was the handling of empty cars by carriers. He was satisfied, he said, that the more prompt use of system cars and the return of foreign cars to proprietary lines would materially increase the number of cars available and would ameliorate existing and prospective shortages.

These latter references of the Director are to the following circumstances. Some railroads own many cars, and some own few. Cars move from the tracks of one road to those of another without restriction. Thus, a railroad has on its lines some of its own, called "system" cars, and some belonging to other railroads, called "foreign" cars. When a company has an emptied foreign car on its lines and needs a car to move freight, it uses that car. Thus, in times of general car shortage, a railroad which owns plenty of cars may not have enough to serve its customers, while one which owns few cars may have ample foreign cars on its lines to supply its demand. While there has been and is a shortage in the total number of cars in the country, we are told that an acute shortage develops each post-harvest season in cars available to move crops in the west. In past years, and in the current year, at the time of crop movement, some western roads have had on their lines less cars than the number which they own. Some eastern roads, on the other hand, are in possession of more cars than the number which they own. While the Commission's report and the affidavits filed before us do not make this situation either certain or clear, the assumption that railroads in the agricultural areas are large owners of cars which are absent from their lines is the basis for the Director's reference to the return of foreign cars to proprietary lines as a measure to ameliorate the acute car shortage.

Under an arrangement among the railroads, called the Car Service and Per Diem Agreement, every road pays a daily rental, called a per diem, for each car on its lines but not owned by it. The Director urged that the Commission institute an investigation into the rules and practices with respect to car-hire, and particularly the compensation paid by carriers for the use of cars not owned by the carriers using them, for the purpose of establishing such rules and such basis and rates of compensation as are calculated to promote the more prompt, economical and efficient use and handling of cars. In another letter, he proposed that the per diem charge be increased from $1.15 to $2 as a stimulant to the prompt handling and return of foreign cars by hiring roads to owning roads.

On December 18, 1946, the Commission ordered an investigation "for the purpose of determining whether the establishment of a rate of $2.00 per day or other increased rate to be paid to the owner for the use of each car during periods of car shortage (except tank and refrigerator) by any common carrier would promote greater efficiency in the use and increase the supply of cars". The investigation proceeded; hearings were had in May, 1947; a proposed report by the examiners was released June 18, 1947; oral argument was had before the Commission en banc on July 9, 1947; and on July 25, 1947, the Commission promulgated the report and order here involved. The examiners had recommended "a temporary increase in the per diem charge with an element of penalty having a direct relation to delinquent handling and delay of box cars". They recommended that for a temporary period the per diem charge be $5 a day on box cars held by one railroad in excess of five days. The Commission rejected the recommendations of the examiners.

The conclusions of the Commission were that the per diem be increased to $2 for six months, October 1, 1947—March 31, 1948, and "that such increased charge will promote greater efficiency in the use and increase the supply of cars (except tank and refrigerator cars), and that such increased charge will be reasonable." Four

of the ten participating Commissioners dissented in three succinct opinions. One concurred because he thought the plan "worth trying". The suit at bar followed.

The authority upon which the Commission based its action was the Interstate Commerce Act,[1] particularly Section 1, paragraphs (10), (11), (13) and (14); and more particularly the last-named paragraph, the pertinent portion of which reads: "The commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle not owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for nonobservance of such rules, regulations, or practices."

At the hearing there was a difference of opinion among counsel as to the theory, and so as to the nature, of the Commission's report and order, and thus some confusion as to the precise questions presented for our decision. Able counsel for the United States, in a careful and thorough brief, say: "The issue of reasonable remuneration for car ownership is not in issue in this proceeding. The issue simply is whether the Commission possessed the necessary authority to increase the per diem charge for the purpose of promoting greater efficiency in the use and supply of cars, and if so, whether such regulation was reasonably exercised."

This is, in effect, an assertion that in prescribing the compensation payable to owners for the use of cars, the Commission may add to reasonable remuneration for car ownership, solely for regulatory purposes, an amount which will tend to cause hiring railroads to return cars promptly. The Director's letter, the order of investigation, the definition of the issues by the presiding examiner, the testimony of Commission witnesses, the examiners' report, and the conclusion of the Commission's report were all upon that theory. The Commission itself said, in its report, "We believe the statute contemplates that a per diem charge for the use of freight cars may be used as an instrument of regulation to control the prompt movement and return of cars."

At one point during the oral argument counsel for the Commission seemed to agree with the foregoing understanding of the issues. Later, however, he suggested that the order might be sustained as a prescription of reasonable remuneration for car ownership, and in his brief he contended that the amount fixed ($2) is not as high as the evidence would warrant if the *value* of the use of cars in times of car shortage is added to the costs of car ownership to get a reasonable compensation to the owner. Counsel for the railroads intervening as defendants, in support of the Commission's order, argue flatly that "No Penalty (Punishment) Per Diem [is] Involved" in the case and that the $2 per diem was designed to compensate the owning railroads in part for the loss of earnings suffered when its cars are on foreign lines.

We think it perfectly clear that from first to last the Commission intended its order to rest upon its asserted power to fix compensation for the use of cars as a regulatory measure, solely for the purpose of increasing efficiency in the use of cars and at an amount wholly independent of the costs of car ownership, expenses of maintenance and operation, and a reasonable profit. We shall discuss that question first. We shall, however, consider the other contention, that the order can be sustained as a determination of reasonable remuneration for car ownership.

The authority of the Commission in respect to car-hire charges is, as we have indicated, in Section 1(14) of the Interstate Commerce Act,[2] and is to be found in the expression "reasonable rules, regulations, and practices with respect to car service * * * including the compensation to be paid * * * for the use of any * * * car * * * not owned by the carrier using it".

---

[1] 49 U.S.C.A. §§ 1–27.

[2] The emergency power under Section 1(15) is not asserted in this case.

It is necessary at the outset to define with clarity the precise question which the case presents. Counsel for the Commission and for the United States argue as though the issue is the Commission's power to prevent or cure the car shortage. They press upon us the critical national and international situation created by lack of cars to move the crops in the west, and the public interest in the adequacy of the car supply. They argue as though the authority to fix compensation for the use of cars were the full extent of the Commission's power to deal with the situation. The most casual examination of the statute shows that such is not the case. The Commission has power, under the above-quoted section, to establish reasonable rules, regulations and practices with respect to car service,[3] which includes the use, interchange and return of cars and the terms of any contract, agreement, or arrangement for the use of cars, and to prescribe penalties for non-observance of its mandates. Those powers are broad. Their scope is not involved here. It would be far afield to consider this case upon the premise that it concerns the full authority of the Commission in what is agreed to be a critical national situation, clearly not only of the present but of a recurring nature. This case concerns only the nature of one specific power.

The specific problem before us is in two parts: first, a matter of statutory construction, and, second, an inquiry into the sufficiency of findings. The first part is an exceedingly narrow question. It is whether the statutory authority to establish "compensation for use" empowers the Commission to fix rentals at such amounts, regardless of the costs of ownership, maintenance, and operation, as in its judgment will operate upon non-owning users of cars to promote greater efficiency in that use. The question must be viewed in the light of several indisputable facts. First, entirely apart from its specific power to prescribe compensation for use, the Commission has general power to make regula-

tions to govern the use and return of cars and to fix penalties for violation of such regulations. Second, the per diem charge applies every day a foreign car is on a railroad. It applies whether the car is moving as expeditiously as possible, or is standing still; whether it is in the hands of a consignee for unloading, of a shipper for loading, or is under control of the railroad; whether it is awaiting bottoms for export or is being held by the railroad for expected freight. Third, the charges are paid by one railroad to another railroad. They do not go into the public treasury as would penalties imposed under the statute.

We think that the correct answer to the question as above-phrased is in the negative. The specific power to fix compensation for the use of cars is not coextensive with the general power to regulate the use of cars. While the determination of proper compensation is a phase of the regulation of use, it is a specific power with definite characteristics and limitations. It is not an elastic concept adaptable in amount for use for other regulatory purposes.

In the first place, the Commission has repeatedly described the rental charge in the terms which we think correct. For example, it has said: "The per diem that complainant pays for car hire is merely equivalent to interest depreciation, insurance, taxes, and other car-ownership costs which it would have to bear if it owned the cars used in interline traffic."[4] And upon another occasion it said: "Since 1909 the per diem rate has been based on the average cost throughout the country of owning and maintaining freight-car equipment, and the rate has been changed from time to time on the basis of the ascertained average cost to members of the association as a whole."[5] Again it said that the per diem "embraces cost of repairs, cost of taxes, cost of replacements, miscellaneous expenses, and 6 per cent interest on the investment."[6] So far as we

---

[3] Section 1(10) of the Act defines "car service", the term which appears in Section 1(14).

[4] Virginia Blue Ridge Ry. v. S. Ry. Co., 96 I.C.C. 591, 593 (1925).

[5] Marcellus & Otisco Co. v. N. Y. C. R. R. Co., 104 I.C.C. 389, 390 (1925).

[6] Rules for Car-Hire Settlement, 160 I. C.C. 369, 378 (1930).

are informed, the Commission, in deciding reasonable per diem rates in specific cases, has always determined reasonableness by a consideration of the costs of car ownership, maintenance and operation.[7] In fact, it is agreed that the Commission has never heretofore in thirty years attempted to include in the per diem charge any extra amount intended for a purely regulatory purpose.

It is true that the Commission has from time to time referred to a "penalty" element in the per diem charge and to its characteristic as an "incentive" for the return of cars to their owners.[8] It has also referred to an expectation of a prompter movement of cars by reason of an increase in the per diem.[9] In the New England Divisions case,[10] it said: "One of the primary purposes of the per diem arrangement is to increase the use of freight equipment through expediting its movement and avoiding detention. Although the charge is intended to cover the cost of ownership, including maintenance, depreciation, taxes, interest, and other allocations incident to ownership, per diem savors of a penalty." But these references must be read against their background. Originally car-hire charges were upon a mileage basis. No rental was paid for a car which was standing still. Therefore, there was no incentive for the hiring road to move the car or to return it. The results were such as to require a change, and a charge upon a time basis was instituted.

Obviously, any charge upon a time basis furnishes an incentive for prompt return of the property. When a contractor rents a bulldozer by the day, he has an incentive to use it promptly and return it; the same is true in the case of a book taken from a lending library at a daily charge. The penalty or incentive characteristic of the per diem is merely an inherent quality of a charge based upon time. Reference to that quality is not equivalent to saying that a rental can, by a prohibitive amount, be made an instrument of compulsion. An inherent quality of its reasonable amount is one thing, but an indefinite expansibility of its amount for regulatory purposes is quite another.

In the second place, in its ordinary and generally-accepted meaning, "reasonable compensation" does not include amounts in addition to actual remuneration. The term is a widely-used and familiar expression, not unlike expressions such as reasonable salaries, reasonable rents, reasonable prices. We know of no departure from the concept that they are based on an equivalence with the thing or service given. "Reasonable compensation for use" does not convey a prohibitory or regulatory idea.

■ In the third place, the per diem charge is so completely unrelated to the evil sought to be remedied by the proposed order that serious question would arise as to its validity as a regulation. A regulatory measure must have "a real and substantial relation to the object sought to be attained."[11] This per diem, however, has no relation to avoidable delay or to inefficiency. It is payable for every day a foreign car is on the line. If a railroad used a car to the maximum possible extent for ten days, it would pay exactly the same per diem as another company which used a car one day and let it stand idle and empty for nine days. The per diem charge, in so far as it penalizes, penalizes use and nonuse, efficient and inefficient use, unavoidable and avoidable delays, alike. It would be deemed arbitrary as a regulatory measure under the established rules of law.

But the decisive consideration is the essential nature of the thing which is proposed to be done here. The car situation involves conflicting economic interests of

---

[7] See, e.g., Hoboken Mfrs. R. Co. v. Abilene & S. Ry. Co., 248 I.C.C. 109 (1941); Rules for Car Hire Settlement, 262 I.C.C. 85 (1945).

[8] E.g., Car Shortage — Insufficient Transportation Facilities, 12 I.C.C. 561, 573 (1907); New England Divisions, 62 I.C.C. 513, 538 (1921).

[9] Car Supply Investigation, 42 I.C.C. 657 (1917).

[10] Supra note 8.

[11] Nebbia v. New York, 1934, 291 U. S. 502, 525, 54 S.Ct. 505, 511, 78 L.Ed. 940, 89 A.L.R. 1469; see also Iversen v. United States, 1946, D.C., 63 F.Supp. 1001, affirmed, 1946, 327 U.S. 767, 66 S.Ct. 925, 90 L.Ed. 998, and cases there cited.

considerable moment. There is the conflict between the great trunk lines, which are organized and able to own large numbers of cars, and the smaller and short-line roads, unable or unequipped to own many cars. The thesis, as the Commission and the Court have explained,[12] has always been that while every road must furnish its share of the total car supply, each may do so by owning or by renting. The burden of renting has been deemed the financial equivalent of owning in this balancing of economic necessities. There is also the conflict between a car owner's interests in restricting its cars to its own lines for its own purposes, and the general interest of the nation in through traffic, with its necessary free interchange of cars. There is the conflict between the economic waste of moving large numbers of empty cars from the unloading areas back to the proprietary lines at certain periods of the year, and the economic efficiency of using unloaded foreign cars for the immediate movement of freight awaiting shipment at the points of unloading. The Commission has insisted in the past,[13] and indeed seems to say in this report, that the extensive movement of empty cars is an economic waste to be avoided.

The Commission does not propose by the pending order to solve these problems by regulations directly addressed to them, but actually the order cuts across all these complex difficulties. If the order results in the prompt return of emptied foreign cars to the owners, regardless of available freight in that direction, it will decide the economic balance between movement of empties and the movement of freight in favor of the former. If the order does not cause hiring roads to release the cars, it will merely transfer tremendous sums of money from non-owners to owners, making the economic status of many non-owners difficult, if not unbearable. According to the estimates in this record, the order would cause an increase in the net per

diems payable, among the major roads, by the New York, New Haven and Hartford of $1,000,000, by Southern Pacific of $1,250,000, by the New York Central of $1,550,000, by the Boston and Maine of $524,000, and so on. This impact of the order would be unavoidable and most severe upon the short lines, most of which are engaged in terminal or stub-end services, where the shipper's 48 hours free time for unloading looms large in the operation. No improvement in car efficiency would result from the order where delays or detention are unavoidable. The sole effect there would be to increase costs.

In so far as the order would accomplish its avowed object, it would be by economic pressure upon the non-owning railroads. Those roads would be faced with a dilemma, either to pay these sums or to let freight on their lines remain unshipped. That is not the scheme of this statute. The statutory plan is that the interchange and return of cars are to be controlled by regulations designed and directed to that purpose,— operating regulations. And the rentals for cars, under whatever system of use and return may be established by the Commission, are to be reasonably compensatory for that use, and no more. The simple expression "compensation for the use of cars" does not describe a process for solving the complex problems of car usage and supply. It neither describes nor authorizes a financial pincers with which to squeeze non-owning railroads. It does not permit the Commission to avoid the difficulties of the car supply problem by simply placing the non-owning roads between an upper millstone of unshipped freight on their lines and the nether millstone of financial penalties. If the movement of empties to the owners is in the public interest for the time being the Act provides for that accomplishment by a direct requirement to that effect. If the thesis that a railroad participating in joint rates can furnish its share of the equipment by renting it is to be abandoned,

---

[12] Virginia Blue Ridge Ry. v. S. Ry. Co., supra note 4; Jefferson & Northwestern Ry. Co. v. M., K. & T. Ry. Co., 102 I.C.C. 72, 75 (1925); Louisville & N. R. Co. v. Central Stock Yards Co., 1909, 212 U.S. 132, 29 S.Ct. 246, 53 L.Ed. 441.

[13] E.g., see testimony of Commissioner Hall, Hearings before House Committee on Interstate and Foreign Commerce on H.R.19546, H.R.20256, and H.R.20352, 64th Cong., 3d Sess. 24 (1917).

the newly-conceived requirements can be made by regulations addressed to the subject. The statute does not provide that these problems be left to the chance decisions of the separate roads, each answer depending upon the road's ability to endure the financial pressure, with a complemental profit to the owning roads.

The fact is that there is no persuasive indication that an increase in car rental will facilitate the return of cars. As early as 1907 the Commission observed, through Commissioner Franklin K. Lane, "That this will be effective in securing return of cars to the owning railroads during the few months of the year when traffic is light may be conceded, but that it will insure return during times of great need is not likely, for in such times the holder could earn perhaps ten times the amount that he would be compelled to pay by using the foreign car."[14] And in the same report the Commission said: "It is submitted that the carriers themselves cannot deal with this problem by raising the per diem charge without seriously limiting the extent and utility of through transportation, a contingency that would demoralize the business of the country." In a formal report,[15] in 1917, the Commission said: "The increased per diem and the progressive demurrage charges may to some extent facilitate the movement of equipment, but they are unlikely to prevent the diversion and misuse of cars at a time when the demands for transportation are so great."

Although the shortage of cars in post-harvest time in the west is a very old problem, and although the per diem charge has been successively increased over the years, there is no finding of fact in this record, and no evidence, so far as we are advised, that the increases ever caused the slightest improvement in the situation. Forty years ago, and again thirty years ago, the Commission made extensive investigations into these same car shortages and the per diem charge.[16] In 1917 it was saying: "The present conditions of car distribution throughout the United States have

no parallel in our history. In some territories the railroads have furnished but a small part of the cars necessary for the transportation of staple articles of commerce, such as coal, grain, lumber, fruits, and vegetables. In consequence mills have shut down, prices have advanced, perishable articles of great value have been destroyed, and hundreds of carloads of food products have been delayed in reaching their natural markets."

Over this whole period the per diem has been increased from time to time. It was originally 20 cents and increased over the years until in 1946 it was $1.15 and has now gone to $1.50. And now the difficulty seems to be precisely as it has been these many years. If it appeared from this long experience that an increase in the per diem is an effective instrument for alleviating car shortages, that fact might furnish some support for the contention that it was intended for that purpose and should be used for it. But the facts appear to be as the Commission predicted in 1907 they would be. Of course, if the language of the statute were plain that car-hire charges could be fixed at prohibitive levels for regulatory purposes, that language would control. But where the expression is "compensation * * * for the use", a term of established meaning, it is difficult to find a Congressional intent at variance with that meaning, when, despite long experience, there is no finding or intimation that the measure has been or will be effective for its newly-asserted purpose.

The railroads which are car owners and intervene in support of the Commission's order, are frank upon this subject. They assert no regulatory purpose or effect. They say, and vigorously, that they are entitled to higher rentals during times of car shortage, because the "value" of their cars is greater at such times. They can earn much more by using their cars in those periods than by renting them. They say that this loss of profits should be taken into account in fixing "reasonable compensation" for the use of these cars by other

---

14 Car Shortage—Insufficient Transportation Facilities, supra note 8.

15 Car Supply Investigation, supra note 9, at 669.

16 Car Shortage—Insufficient Transportation Facilities, supra note 8; Car Supply Investigation, supra note 9.

roads. This position, while having the virtue of reality and frankness, is far removed from the theory of regulatory use in the public interest. There is a public interest in the availability of cars for crop movement, but there appears to be no public interest in the payment of larger sums by some railroads to other railroads during times of car shortage. The term ordinarily applied to that practice in respect to other commodities is profiteering. To justify that course of action, the public benefit ought to appear clearly, and the efficacy of increased charges as a means to that end ought to appear. We are asked to construe this otherwise plain statutory provision so as to require some railroads to pay other railroads large sums of money during times of car shortage, in spite of the failure of forty years of experience to show any alleviation of car shortages by that means. We cannot do so.

Several paragraphs in the Commission's report raise questions as to the validity of the order finally entered. For example, one paragraph reads: "In times of car shortage the car service division of the Association endeavors to promote the direct movement of empty cars from point of release to the nearest loading territory. The car service rules as they apply to box cars, although not suspended, are not actually being observed and there is no penalty for their violation. In other words, foreign cars are being appropriated for loading largely in disregard of the car service rules. This probably results in the least empty car mileage in relation to the loaded car-miles. From the standpoint of efficiency in the use of cars, this policy cannot be questioned. However, it does not do entire justice to the railroads, and to the shippers located on the railroads, which own an adequate supply of cars as compared with other railroads which are not adequately supplied with cars, and are using the cars of foreign lines even for their local traffic, without regard to their expeditious return to the owner."

That paragraph seems to say that the car service rules now in existence are designed to promote the return of empty cars to their owners. If this is so, and if this is desirable practice in the public interest, why should those rules not be observed? If no penalties for their violation are provided, why should they not be? Contrariwise, if the movement of empties to the nearest loading territory instead of to the owners cannot be questioned from the standpoint of efficiency in the use of cars, how can the proposed method of promoting return of cars to owners be justified from the standpoint of efficiency? If the existing rules have the same object as the proposed order, the violation of the former and the enforcement of the latter cannot both be justified on the same ground. Which is really the proper course "from the standpoint of efficiency in use"—movement to the nearest loading territory, or return to the owners? Does the conclusion of the Commission stated in the quoted paragraph mean that while the movement of empty cars to the nearest loading territory cannot be questioned from the standpoint of efficiency in the use of cars, nevertheless, in justice to the owning railroads, higher rentals should be paid in times of car shortage? Is not the sole public interest in times of car shortage the efficient use of cars? Does the public interest require, not efficiency in use, but "justice" to the owning railroads in terms of higher rentals? We do not think so. We do not see how an acute public need for cars to move crops can be translated into an order designed to do justice to the owning railroads in terms of rent to be paid. The Commission's report raises these questions, but it does not supply the answers.

Both petitioners and defendants press upon us the legislative history of the statute as supporting their respective positions. There is no direct evidence, such as a definitive committee report, as to the intent of the phrase "compensation for use". All parties attempt to deduce an intent from the circumstances.

Prior to 1917 there was no government authority over the use and interchange of cars. In 1916 an acute shortage developed. The Commission investigated, and in its 1916 report [17] it asked Congress to give it authority to "prescribe for all carriers by rail subject to the act rules and regulations

---

[17] Thirtieth Annual Report of the Interstate Commerce Commission (1916).

governing interchange of cars, return of cars to the owning road, the conditions and circumstances under which such cars may be loaded on foreign roads, and the compensation which carriers shall pay to each other for the use of each other's cars."[18] As the basis for this request, the Commission called attention to Section 1 of the Interstate Commerce Act, which requires carriers to establish through routes "and to make reasonable rules and regulations with respect to the exchange, interchange, and return of cars used therein, and for the operation of such through routes, and providing for reasonable compensation to those entitled thereto."[19] The Commission described a case [20] in which a railroad had prohibited certain of its cars from leaving its lines, in an attempt to retain on its lines sufficient cars to serve the communities on them. The Commission voided the railroad's action, holding that the Act requires a railroad to serve established through routes regardless of the fact that such service might require the movement of their cars beyond their own lines. On the other hand, the Commission pointed out the difficulties created when some carriers failed to keep themselves on a substantial parity with the others in equipment and used the others' equipment under a per diem which was moderate, if not nominal, "disregarding entirely the rules adopted by the carriers relative to the use and return of such cars."[21] In the course of its report, the Commission observed:[22] "It seems obvious, therefore, that rules regarding the use and return of carriers' cars and the compensation to be paid by one carrier for the use of another carrier's cars must be uniform for the entire country. It is quite probable that it would be reasonable, desirable, and proper to make those rules more drastic and the compensation higher during periods of so-called 'car shortage' than during other periods when there is an abundance of equipment and transportation facilities."

In the ensuing hearings the Commission informed the Congress of the past history of the per diem, its characteristics, and the fact that it had been increased from time to time. At the same time it pointed out [23] that "It is, generally speaking, in the public interest that the shipment which is awaiting movement should be moved and that the car should not go off empty in the direction of home and leave that shipment unmoved."

The result of the Commission's recommendation was the Esch Car Service Act of 1917,[24] which added to the Interstate Commerce Act the paragraphs which now, after amendments in 1920, and 1940, appear as paragraphs 10 to 17 of Section 1 of the Act.

▮ Defendants argue that the fact that Congress knew of the past practice of the railroads, and the incentive or penalty nature of the per diem, shows that Congress intended that "compensation for use" might be utilized by the Commission as an instrument of compulsion for regulatory purposes. But it can be argued with equal force that since the reason for the enactment was the preservation of a free interchange of cars during times of car shortage, Congress did not intend to provide a means for restricting, or discontinuing, the presence of foreign cars on a railroad's lines; that the free movement of through traffic was the predominant purpose. It can be argued forcefully that if the natural instinct of car owners to hold their cars on their own lines in times of car shortage was an evil then sought to be eliminated, that same practice cannot now be said to be the beneficent objective of the Act. In any event, we do not think that the legislative history demonstrates the intent which defendants so confidently assert that it does. It seems to us that this legislative history supports the plan of the statute as we see it upon reading the text; that the operations of use, interchange and return of cars are to be controlled by operational regulations specifically designed to fit the complex conditions involved and the public interest under varying circumstances; and

---

[18] Id. at 73.
[19] Id. at 70.
[20] Missouri & Illinois Coal Co. v. Ill. Cent. R. R. Co., 22 I.C.C. 39 (1911).

[21] Thirtieth Annual Report, supra note 17, at 72.
[22] Id. at 71.
[23] Supra note 13.
[24] 40 Stat. 101, 49 U.S.C.A. § 1(11).

that car rentals are to be "reasonable compensation for use" under whatever plan of use is adopted.

Much emphasis is laid by the Commission and the United States upon the proposition that the per diem rental charge has the same essential qualities as has demurrage, the power to prescribe which as an emergency matter was sustained in the Iversen case.[25] But it seems to us that the differences are far greater than the similarities. "The purpose of demurrage charges," the Supreme Court said in Pennsylvania R. Co. v. Kittaning Iron & Steel Mfg. Co.,[26] "is to promote car efficiency by penalizing undue detention of cars." Demurrage is arranged to fit that purpose, with free time allowances sufficient to permit reasonably prompt unloading. It applies directly and exclusively to the objective sought, i.e., the prevention of detention of cars beyond a reasonable time. Both in nature and in purpose demurrage is a regulatory measure. "Reasonable compensation for use" has none of those decisive characteristics which the Court found in demurrage charges.

The Commission and the United States rely upon views which they find in the dissenting opinion of Justice Stone, with whom Justice Holmes and Justice Brandeis concurred, in Chicago, R. I. & P. Ry. Co. v. United States.[27] The exhaustive opinions in that case contain much historical and other data relative to the per diem. The Court divided upon one provision in the Commission's order there involved. In establishing reasonable compensation for the use of cars, the Commission had allowed certain roads and for certain purposes credit for two days free time. The Court held that provision invalid, upon the ground that it permitted the use of property without requiring compensation for it. It held that the per diem is neither more nor less than compensation for the use of property. It quoted with approval the following definition of the per diem: " 'The per diem that complainant pays for car hire is merely equivalent to interest, deprecia-

tion, insurance, taxes, and other car-ownership costs which it would have to bear if it owned the cars used in interline traffic. The car owner incurs these costs in the first instance, and is reimbursed by complainant [a short line] through the per diem or rental charges, thereby relieving the latter of the necessity of investing in equipment for this service'."[28]

Besides the fact that the view now urged upon us is that of a minority of the Court, we do not find in the dissent an intimation that the views of those justices would support the validity of an order such as the one now before us. The theory of the dissent was that the per diem is a method of apportioning the car-hire charges of a joint haul, and is proper for this purpose because of its regulatory characteristics. The disadvantageous position of the short lines under the literal application of the per diem was a major premise in the opinion. The indicated thought was that the penalizing characteristic of the per diem made an adjustment for unavoidable delay proper and valid. That the per diem was fair compensation to the owner was emphasized. Justice Stone nowhere indicated that a per diem might be fixed in amount as a prohibitory or regulatory measure, without regard to the limits of fair remuneration or fair compensatory charge, or that such a per diem might be applied indiscriminately to all use, whether efficient or the opposite.

It is urged by defendants that compensation has full regulatory characteristics because it is included by the statute among the regulatory powers. The language is "reasonable rules, regulations, and practices * * *, *including* the compensation", etc. It is perfectly true that the prescription of compensation is a species of regulation, and is included by the statute as such. But it does not follow that it is a substitute for other sorts of regulation, or is usable for other regulatory purposes. As a matter of general statutory construction, and of ordinary logical thought, every species in a general class is not necessarily

---

[25] Supra note 11.
[26] 253 U.S. 319, 323, 40 S.Ct. 532, 533, 64 L.Ed. 928, 930 (1920).

[27] 284 U.S. 80, 100, 52 S.Ct. 87, 76 L. Ed. 177 (1931).
[28] Id. at page 97, 52 S.Ct. at page 93, 76 L.Ed. 177.

identical in characteristics with every other species in that class.

It is true that where an economic maladjustment is one of price, resulting in conditions adverse to the public welfare, the legislature may, and sometimes does, authorize the fixing of minimum prices,[29] and the natural and ordinary effects of such price fixing may be regulatory or corrective of other practices of the industry. But the proposal in the present case does not fall within that class. The regulatory effects in such situations are those which flow from fair and reasonable prices. The proposal here is that "reasonable compensation for use" can itself be an amount selected solely for a regulatory purpose, and quite apart from full remuneration for ownership. To sustain that proposal, we would have to find it in plain language of the Congress. We do not find it in the words "reasonable compensation for use". Our attention has not been called to any instance in which a legislature has required one section of the public to pay another section prices avowedly in excess of fair recompense to the producer or seller solely to achieve an economic result. That this matter is not a mere technicality is amply proven by the bitter debates on the subject in and out of Congress during the period of OPA. The Emergency Price Control Act contained a provision in respect to it.[30]

The statement of the Commission, in the report before us, that the railroads were unable to suggest a scheme of regulation which would differentiate between avoidable and unavoidable delay in car handling, which is offered to us as a reason why the Commission had not theretofore acted directly, does not seem to us to indicate a necessity for the now-proposed order. The railroads are divided in their interests and in their views. It is natural and inevitable that they would be unable to formulate or suggest a plan of regulation. That is the situation in many controversial fields of necessary regulation, but it would indeed be an odd conclusion to hold that regulation in the public interest is impossible because the companies to be regulated assert that they are unable to suggest, or to agree upon, an acceptable method of regulation. The Commission does not say that it, the Commission, cannot devise an effective method of direct regulation.

As a matter of fact, the Commission, in a proceeding entitled "Car Service, Freight Cars", concurrent with the one here involved, and in an order [31] simultaneous with this one, considered the whole of car service rules, found that they provide that a freight car, unloaded at a point on a line of a carrier other than the owner, shall be moved, loaded or empty, to or in the direction of the owning road, but that those rules were being largely disregarded at the present time. The Commission ordered that the railroads file their car service rules with the Commission, so that they would become obligatory. The Commission there said that "if it should later appear that conditions might be improved by a modification of, or addition to, the car-service rules as so filed, action by us with that object in view can be taken." Furthermore, we are advised [32] that since the argument in this case, and before the briefs were filed, the Commission exerted its emergency power under Section 1(15) of the statute with an operating regulation for car movement, which directly controls the removal and return of empty cars, and imposes penalties for non-observance. That Order appears, from a reading of the text, to be a direct action, clearly regulatory in character, upon the same problem and for the same purpose as was the vaguely hopeful, roundabout measure before us in the case at bar. The Commission apparently has now stepped in to control the handling of empty cars, instead of merely increasing the rentals to be paid one railroad by another and trusting that from that step there would be some corollary effect in the public interest.

---

[29] Nebbia v. New York, 1934, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940; United States v. Rock Royal Co-Op., 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Sunshine Coal Co. v. Adkins, 1940, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263.

[30] Sec. 2 (h) of the Act, 50 U.S.C.A. Appendix, § 902(h).

[31] 268 I.C.C. 687.

[32] Service Order No. 778, 12 Fed.Reg. 6811 (Oct. 17, 1947).

[6] We hold that the statutory authority to fix reasonable compensation for the use of cars does not empower the Commission to establish, solely for general car-service regulatory purposes, rentals in excess of any purported reasonable recompense to the owner.

But, even if the Commission had the power it claims, the findings in its report are insufficient to support its order. We have examined the report with care, in an effort to find the obviously requisite determinations. There is no finding that the public interest in the return of cars to the owning railroads outweighs the public interest in the prompt movement of freight awaiting shipment at the initial unloading point of the car. There is no finding that an increase in the per diem would cause the return of a single car to its owner. There is no finding that in times of car shortage the necessities of non-owning railroads are less than those of the owning railroads. There is no finding that the present need for cars is on the owning roads rather than on the hiring roads. There is no finding that the roads which serve the large crop areas are owning roads. There is no finding as to what freight needs immediate movement. The report recites testimony concerning the length of "delays" in handling cars, but none on the causes for delays, and contains no conclusions of fact on either subject. It contains a tabulation showing car locations as of May 1, 1947, but no such data for the harvest season. Numerous contentions of the parties are related. The opinions and suggestions of several witnesses as to the effect of increased per diem charges, are recited, but no factual data from experience appears, and no underlying fact-finding whatever upon the point; the ultimate conclusion as to that effect is wholly without factual finding in support. That there are complaints that the existing $1.15 and $1.25 per diems are unjust and unreasonable in so far as they exceed 95 cents, is told. The flat finding is made that "The present car shortage is the result of postwar demands upon an inadequate and war-depleted car supply," a finding which seems to negative the idea that the shortage is due to inefficiency in use. The following findings are made:

"Respondents introduced evidence tending to show that the available car supply is, upon the whole, economically and efficiently utilized. Over-all efficiency is indicated by the following facts: [listing them]."

"There has been a continuing cooperative effort between the shipping public and the railroads for the past several years in the matter of efficiency of car use. The results have been productive of increased efficiency. This can be measured in heavier loading; in more prompt loading and unloading; and the decrease in the number of cars held by industry beyond free time."

"The more prompt loading and unloading of cars is partially reflected in the faster movement of cars as shown in the records of miles per car per day."

"Efficient use of freight cars calls for the least empty car mileage consistent with distribution requirements. Evidence of the more direct movement of empty cars from the point where released to the nearest loading territory is found in the trend of average percentage of empty car-miles to total car-miles. The reduction in recent years is shown in the following table: * * *"

Other similar findings are made as to increased efficiency in car use in recent years, but none as to a decrease in that efficiency. The average freight revenue per freight-car day for three named railroads, but for none others, is found. Findings as to the net per diems payable and receivable by the railroads in 1946 are shown in a table. Many railroads in the western sections appear as debit roads[33] in that tabulation—including such as the Chicago and North Western, the Chicago, Rock Island and Pacific, the Southern Pacific, the Burlington-Rock Island, the Texas and New Orleans, and others. The report does not indicate the cause or significance of these facts concerning the western roads—why they are net debit roads, or

---

[33] The "debit" roads are those which pay more than they receive in per diem charges.

why an increase in the per diem would benefit them, or, if not, why the credit roads in the crop area should be favored over the debit roads in the same area. Some facts as to the New Haven road are recited.

The insufficiency of the recitations in the report, even when meticulously filtered to collect the facts, is obvious. There are findings which seem to indicate a result opposite to that reached by the Commission, some which are wholly doubtful in effect and meaning, but none which explain or support an order increasing the per diem charge in order to secure greater efficiency in the use of cars. We hold the order invalid upon the second ground, that there are not the requisite underlying findings of fact to support it.

The contention of Commission counsel, and of counsel for the intervening-defendant railroads, that the order involved can be sustained as an order fixing compensation in the wholly remunerative sense, is quickly disposed of. There was no hearing upon that proposal. The notice did not reveal it, and the examiners otherwise defined the issues at the taking of the testimony. There are no findings of fact upon which the order could rest, if upon that theory. Such findings are wholly missing. The court could not possibly tell from the findings whether the order, if it purported to fix only remuneration for car ownership, was fair and reasonable, or was unfair, unreasonable, and arbitrary. No findings of underlying facts which might be used as standards for that determination are in the report. We think it clear that the Commission neither intended to, nor did, rest its order upon that theory, and we doubt its ability to do so.

It follows from all the foregoing that the order of the Commission involved in this action must be set aside, because it is beyond the statutory power of the Commission, and also because, even if the statutory power existed, this order is not supported by the requisite findings of fact. Orders to that effect may be presented by counsel.