**ILLINOIS TERMINAL RAILROAD COMPANY, Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

No. 75–1497.

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1976.

Decided Sept. 2, 1976.

Rehearing and Rehearing En Banc Denied Sept. 24, 1976.

George E. Lee, St. Louis, Mo., for petitioner; Doris J. Banta, St. Louis, Mo., R. T. Molloy, Washington, D.C., and Richard M. Johnson, Vienna, Va., on brief.

Lloyd J. Osborn, Washington, D.C., for respondents; Thomas E. Kauper, Asst. Atty. Gen. and Barry B. Grossman, Atty. Dept. of Justice, for United States and Arthur J. Cerra, Gen. Counsel, on brief.

Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and WEBSTER, Circuit Judges.

LAY, Circuit Judge.

This is a petition for review of an Interstate Commerce Commission (ICC) order brought by the Illinois Terminal Railroad Company. It challenges an order of the ICC requiring specific use of "incentive per diem" (IPD) funds received by petitioner from other railroads as rental for its boxcars. In 1966 Congress authorized the ICC to establish incentive per diem rates to be charged on certain railroad car rentals. *See* 49 U.S.C. § 1(14)(a) (1966). The legislation arose from the long history of a national boxcar shortage. Since under the prior rate-setting system it was often cheaper for railroads to rent cars than to own them, the IPD charges were intended to encourage purchasing, building, or rebuilding of boxcars.[1]

Pursuant to § 1(14)(a), the ICC promulgated an order determining the IPD rates; the duration of the charges (initially only during peak use periods (6 of the 12 months), but in 1973, during the Russian wheat sales, extended to cover the entire year); and that the IPD income had to be "earmarked" and segregated into a fund which could be drawn on by the owner railroad, under certain conditions, to purchase, rebuild, or maintain the cars.[2]

The IPD receipts are considered as gross income for federal income tax purposes and

---

1. For a discussion of this history and related problems in rate-fixing, *see Boston & Me. R.R. v. United States*, 297 F.Supp. 615 (D.Mass.), *aff'd per curiam*, 396 U.S. 27, 90 S.Ct. 196, 24 L.Ed.2d 142 (1969); *Chicago, B. & Q. Ry. v. N.Y. S. & W. R.R.*, 332 I.C.C. 176 (1968), *aff'd sub nom. Union Pacific R.R. v. United States*, 300 F.Supp. 318 (D.Neb.1969); *Palmer v. United States*, 75 F.Supp. 63 (D.D.C.1947).

2. The applicable regulations in 49 C.F.R. provide:

   § 1036.3 Earmarking.

   Each common carrier by railroad shall segregate in Account 716, Capital and Other Reserve Funds, and shall transfer from Account 798, Retain Income, Unappropriated to Account 797, Retained Income, Appropriated, an amount equal to the net credit balance resulting from any incentive per diem settlement involving boxcars subject to this part. The carrier shall maintain a separate bank account for the segregated funds. . . The earmarked funds shall be reduced by the amount of the additional income tax paid as the result of increasing taxable income by

must be reported as such by creditor-railroads. Since the IPD receipts are subject to federal income tax, the ICC ruled that only IPD amounts received *less taxes creat-*

inclusion of net incentive per diem earnings. The funds in such account shall be used to purchase, lease, or build new, unequipped boxcars for general service or to rebuild general service, unequipped boxcars with code numbers and mechanical designations set forth in § 1036.1 for addition to such carrier's or designee's fleet in accordance with this part. The unexpended funds remaining in the accounts of the carriers may be invested in Government bonds or other interest-bearing, temporary securities. The interest earned thereafter shall become part of the earmarked fund.

§ 1036.4 Use of Funds.

The net credit balances resulting from incentive per diem settlements, which are earmarked in accordance with § 1036.3, may be drawn down in whole or in part at any time by the carrier to build, lease equivalent of purchase, or purchase, in whole or in part, new unequipped boxcars for general service described in § 1036.1, *provided*, the carrier has in the same calendar year built, leased, or purchased its 1964–68 average acquisitions of such boxcars and made up an arrearage in having failed to maintain such average each year this order is in effect. Earmarked funds may also be used in whole or in part to lease any number of new unequipped boxcars for general service described in § 1036.1, in which the carrier is not acquiring an equity interest, *provided*, the carrier has in the same calendar year leased its 1964–68 average number of such boxcars and made up any arrearage in having failed to maintain such average each year the order is in effect. Non-equity leases must be at least 10 years in duration, and, in connection with such leases, earmarked funds must not be used for the cost of maintenance. Earmarked funds may be used in whole or in part to rebuild any number or portion of general service, unequipped boxcars described in § 1036.1, *provided*, the carrier has in the same calendar year rebuilt its 1964–68 average number of such boxcars and made up any arrearage in having failed to maintain such average each year the order is in effect. . . . However, upon application, including a showing that all parties to the proceeding herein have been notified by the carrier of such application and a showing of good cause why any carrier is unable to draw down in whole or in part the net credit balance resulting from incentive per diem settlements because it cannot comply with the above test period average requirements of having in the same calendar year built, rebuilt, leased or purchased its 1964–68 average number of such boxcars and made up any arrearage in hav-ing failed to maintain such average each year this order is in effect, the Commission may, in its discretion, after consideration of all views regarding the application, modify the test period average to the extent consistent with the public interest and the national transportation policy. Such modification, as a minimum, shall require that a carrier match the earmarked funds it will use with an equal amount of its own funds. Earmarked funds must be put to use within 18 months after the end of the calendar year in which the funds are collected and result in a net credit balance for the building, rebuilding, leasing, or purchasing of general service, unequipped boxcars described in § 1036.1 for addition to such carrier's or designee's fleet in accordance with this part. Upon a showing of good cause in application, including a showing that the parties to the proceeding herein have been notified by the carrier of such application may be made to the Commission for waiver of the said 18-month period, which may, in the Commission's discretion, be granted after consideration of all views regarding the application. If the earmarked funds are not used within the 18-month period, they may be voluntarily surrendered to Rail Box whose establishment and operation was approved in Finance Docket No. 27589, *American Rail Box Car Company and Trailer Train Company, et al.—For Approval of the Pooling of Car Service with Respect to Box Cars.* If the carrier fails within the stated period to put to use collected earmarked funds which result in a net credit balance, has not obtained relief from that requirement, and has not surrendered such funds to Rail Box, the Commission will investigate the matter to determine what, if any, corrective action is warranted. Appropriate corrective action would include section 16(12) remedies among others. Carriers may make temporary investments of unexpended funds in Government bonds or other liquid securities. Such securities must be readily convertible to cash so that funds remain available for boxcar purchases. Interest earned must become part of the earmarked fund. As used in this section, "build," "rebuilt," "lease," or "purchase" refer to a commitment to build, rebuild, lease, or purchase which results in the acquisition of a car on line ready for use within 10 months from the date of commitment, except that in extraordinary cases beyond the control of the carrier or the car supplier, a car that is delivered after 10 months from the date of commitment may qualify if approved by the Bureau of Accounts of this Commission.

*ed and paid* as a result of IPD revenue are to be earmarked. 49 C.R.F. § 1036.3.

Illinois Terminal Railroad Co. has paid into the IPD fund incentive amounts received for rental of its cars. Between 1962–65 and 1967–69 petitioner suffered net operating losses (NOL) which, under Int. Rev.Code of 1954, § 172(b)(1)(C), can be carried forward and offset against future income for seven years. In the years 1970–73, petitioner had income of $3,060,510 for federal income tax purposes, and $2,664,321 for ICC reporting purposes. Of the latter figure, $1,295,910 was directly attributable to IPD receipts. In the later years, petitioner utilized its NOL carry forward cancelling all tax liability on its current year's income, including income from IPD receipts. Thus, there was no reduction of earmarked IPD amounts due to federal income tax payments. Petitioner, however, reported a transfer of $673,958.48 from its IPD account to general corporate funds. That amount represented the income taxes which properly would have been charged to the IPD funds had no NOL carryover been available. The ICC Bureau of Accounts disallowed the transfer. On petition for modification of that order the Commission affirmed the reimbursement order finding that the deduction from the IPD account for income taxes *not* payable because of petitioner's NOL carryover, did not come within the meaning of a deduction for income taxes *paid*. Ex Parte No. 252 (Sub-No. 1) (Feb. 10, 1975).

The railroad in its petition for review urges that the ICC lacks statutory authorization to require *earmarking* of IPD funds. Alternatively, it contends that, if the Commission has the power to require earmarking, the order depriving them of the deduction for NOL carryover benefits from IPD funds violates the statute, ICC regulations, and petitioner's constitutional rights.

The statute in question, § 1(14)(a) of the Interstate Commerce Act, reads:

The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle not owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for nonobservance of such rules, regulations, or practices. In fixing such compensation to be paid for the use of any type of freight car, the Commission shall give consideration to the national level of ownership of such type of freight car and to other factors affecting the adequacy of the national freight car supply, and shall, on the basis of such consideration, determine whether compensation should be computed solely on the basis of elements of ownership expense involved in owning and maintaining such type of freight car, including a fair return on value, or whether such compensation should be increased by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense. The Commission shall not make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate and may exempt from the compensation to be paid by any group of carrier such incentive element or elements if the Commission finds it to be in the national interest.

49 U.S.C. § 1(14)(a) (1966).[3]

■ Petitioner argues that Congress, through this statute, authorized the ICC

---

**3.** Pending this petition for review the act has once again been amended by the Railroad Revi-

talization and Regulatory Reform Act of 1976, Pub.L. 94–210, 90 Stat. 31, *et seq.* to read:

only to *encourage* car ownership through the use of incentive rates and no authority to require earmarking was given. We must disagree. We find the earmarking requirement to be "a legitimate, reasonable, and direct adjunct to the Commission's explicit statutory power" to authorize IPD rates. *See United States v. Chesapeake & Ohio Ry.*, —— U.S. ——, 96 S.Ct. 2318, 49 L.Ed. 2d 14 (1976).[4]

The Supreme Court observed in *Chesapeake*:

The Congress has charged the Commission with the task of determining whether the rates proposed by the carriers are "just and reasonable." 49 U.S.C. § 1(5). In fulfilling this obligation, the Commission must assess the proposed rates not only against the backdrop of the National Transportation Policy, 54 Stat. 897, 49 U.S.C. preceding § 1, but also with specific reference to the statutory criteria set forth by the Congress to guide the rate-setting process. These provisions, in short, require the Commission to ensure that the rate imposed on the traveling or the shipping public will support both an economically sound and efficient rail transportation system.

*Id.* at 2323 (footnotes omitted).

■ These same principles must guide the Commission in establishing the incentive per diem rates under § 1(14)(a). The background leading to Congressional approval of the IPD rates is well-known. The opinion of Judge Prettyman in *Palmer v. United States*, 75 F.Supp. 63 (D.D.C.1947), pointed out that an incentive rate is "regulatory," not "compensatory," and found no authority for such a rate under the pre-1966 statute. The 1966 amendment cured that problem by expressly allowing the Commission to consider the national level of ownership and other factors in determining "whether compensation should be computed solely on the basis of elements of ownership

(14)(a) It is the intent of the Congress to encourage the purchase, acquisition, and efficient utilization of freight cars. In order to carry out such intent, the Commission may, upon complaint of an interested party or upon its own initiate without complaint, and after notice and an opportunity for a hearing, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this part, including (i) the compensation to be paid for the use of any locomotive, freight car, or other vehicle, (ii) the other terms of any contract, agreement, or arrangement for the use of any locomotive, or other vehicle not owned by the carrier by which it is used (and whether or not owned by another carrier, shipper, or third party), and (iii) the penalties or other sanctions for nonobservance of such rules, regulations, or practices. In determining the rates of compensation to be paid for each type of freight car, the Commission shall give consideration to the transportation use of each type of freight car, to the national level of ownership of each such type of freight car, and to other factors affecting the adequacy of the national freight car supply. Such compensation shall be fixed on the basis of the elements of ownership expense involved in owning and maintaining each such type of freight car, including a fair return on the cost of such type of freight car (giving due consideration to current costs of capital, repairs, materials, parts, and labor). Such compensation may be increased by any incentive element which will, in the judgment of the Commission, provide just and reasonable compensation to freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense. The Commission shall not make any incentive element applicable to any type of freight car if the Commission finds that the supply of such type of freight car is adequate. The Commission may exempt such incentive element from the compensation to be paid by any carrier or group of carriers if the Commission finds that such an exemption is in the national interest.

(b) The Commission shall, within 18 months after the date of enactment of this Act, revise its rules, regulations, and practices with respect to car service, in accordance with the amendment made by subsection (a) of this section.

4. In *Chesapeake* an ICC order approving a general revenue increase was conditioned on the railroads' spending the increased revenue on capital improvements and maintenance of plant and equipment. In reversing the issuance of an injunction against the ICC's condition the Supreme Court held that the Commission, as a condition for not suspending and subsequently investigating the reasonableness of a proposed tariff, could require railroads to use the additional revenues for the purposes they invoked in support of the increase.

expense . . . or whether such compensation should be increased by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to freight car owners, contribute to sound car service practices . . . and encourage the acquisition and maintenance of a car supply. . . ." 49 U.S.C. § 1(14)(a) (1966). Under the statute, before the Commission can establish a rule, regulation, or practice aimed at alleviating car shortage it must investigate and find that there is indeed an inadequate car supply. *See United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1971). Section 1(14)(a) expressly states that the Commission cannot make an incentive element applicable to any type of car where it finds the supply adequate. Thus, it is obvious that the IPD charges are regulatory and not compensatory. The IPD income represents compensation above and beyond the base costs of freight car ownership. Under these circumstances the adjunct power to earmark such funds for a specific use, insuring that there will not be "profiteering" as Judge Prettyman feared,[5] is implicit in the Congressional mandate authorizing use of the IPD charge when necessary to alleviate the shortage.[6]

Analogous to the Supreme Court holding in *Chesapeake*, we find the Commission's order requiring earmarking of IPD funds directly related to the reasonableness of the use of incentive rates. It is the authorized means to accomplish the end sought. As the Court observed in *Fla. E. Coast Ry. v. United States*, 368 F.Supp. 1009, 1017 (M.D. Fla.1973), "the earmarking of funds provision of the ICC regulation, which provides the heart and soul of the entire plan, is also rationally supported as a method helping to alleviate the shortage." (Emphasis added).

Further support for the Commission's earmarking order can be found in the express authority given the ICC to "establish reasonable rules, regulations, and practices with respect to car service," 49 U.S.C. § 1(14)(a), in light of the definition of "car service" in 49 U.S.C. § 1(10) to include car supply.[7]

We turn now to the railroad's attack on the Commission's ruling regarding its NOL deduction offsetting IPD earnings during 1970–73. The Commission gave early notice that the earmarked IPD accounts could be reduced for any increase in taxes resulting from incentive per diem earnings so that general corporate funds would not have to be depleted. 343 I.C.C. 49, 65 (1973). By reason of petitioner's NOL carry-forward its IPD income during 1970–73 was offset and no tax was paid on the IPD funds. The railroad claims that this use will cause early exhaustion of its NOL resulting in increased income tax liability in future years. Thus, petitioner argues, it is being denied the benefit of its NOL deduction without receiving any benefit in re-

---

5. *See Palmer*, 75 F.Supp. at 71.

6. The House Report supports this view:
   If the railroads and their associations cannot meet this demanding problem [boxcar shortage], then we believe the Commission should have the *necessary tools* to solve this difficult and long-continuing dilemma.
   H.R.Rep.No.1183, 89th Cong., 2d Sess. 2227, 2230 (1966), U.S.Code Cong. & Admin.News 1966, pp. 2227, 2230 (emphasis added).

7. The history is set forth in a law review commentation:
   Introducing the bill [Transp. Act of 1920], its author, Congressman Esch, noted that certain proposed amendments to the Interstate Commerce Act were expressly intended to overrule *Pennsylvania R.R.* The addition of "supply" to the definition of "car service" in section 1(10), he said, "would give the commission power to order the carrier to supply itself with cars."
   Comment, *The Freight Car Shortage and ICC Regulation*, 85 Harv.L.Rev. 1583, 1599 (1972) (footnotes omitted), citing 58 Cong.Rec. 8309, 8316 (1919) (Speech of Congressman Esch, Chairman of House Comm. on Interstate & Foreign Commerce, Nov. 11, 1919, on H.R. 10453).
   *See also House Comm. on Interstate & Foreign Commerce, Return of Railroads to Private Ownership*, H.R.Rep.No.456, 66th Cong., 1st Sess. 17 (1919). *See also id.* at 27–28; *Hearings on H.R. 4387 Before the House Comm. on Interstate & Foreign Commerce*, 66th Cong. 1st Sess., vol. I, at 11–12 (1919) (statement of ICC Commissioner Clark).

turn, thereby receiving arbitrary and unequal treatment. We do not agree.

The regulation provides, in part: "The earmarked funds shall be reduced by the amount of the additional income tax *paid* as the result of increasing taxable income by inclusion of net incentive per diem earnings." 49 C.F.R. § 1036.3 (emphasis added). The language is clear, a deduction is permitted for taxes *paid*. The purpose of the provision is to prevent a reduction in the general corporate account because of increased tax liability created by IPD income. IPD funds are to be reduced to cover for general corporate funds expended. When no taxes are paid there is no reduction in funds in the general corporate account.

Here the railroad offset IPD income for the years 1970–73 with deductions for NOL carryovers, thus avoiding paying any taxes. The savings to the railroad can be used by them for investment in its own car fleet. Avoidance of taxes on IPD income through the use of NOLs is not equivalent to the payment of taxes on IPD income with general corporate funds, within the meaning of the regulation.[8]

Furthermore, petitioner's claim that the application of its NOL carryovers against IPD income, causing early exhaustion of its NOL and increased income tax liability in future years, violates its Fifth Amendment right to be justly compensated for the taking of its property is not well-founded. The government concedes that the taxpayer cannot be arbitrarily deprived of this property right. However, even assuming petitioner would earn sufficient taxable income to make use of the NOL carryovers in the future, an assumption which petitioner itself conceded to be unlikely, no arbitrary taking of property will result. Under the Commission's ruling, as the government observes, petitioner will be permitted "to reduce its IPD account to the extent that (the) carrier is forced to pay taxes in future years which could have been avoided but for the use of NOL carryovers to offset IPD income." Joint Brief of United States and Interstate Commerce Commission at 28.

Given the validity of the earmarking provision and the IPD program's objective of augmenting the national car fleet, the Commission's treatment of the taxation of IPD income is just and reasonable.

The order of ICC is affirmed.

---

8. The Commission sets forth cogent reasons for the rule permitting a reduction of the IPD account only for income taxes actually paid. It states:

> The Commission has avoided the complications which would arise in attempting to ascertain the source of every deduction which might be taken from gross income—be it an NOL deduction, an accelerated depreciation deduction, or any other permissible deduction. The IPD account may simply be reduced when and if taxes are paid; if taxes are not paid, the IPD account may not be reduced and the basis upon which taxes were avoided need not be a matter of concern. By the same token, IPD *losses* equitably may be carried back or forward to offset income from other sources, and there would be no requirement that the general tax saving be transferred to the IPD account.

Joint Brief of United States and Interstate Commerce Commission at 29–30.