**CONSOLIDATED RAIL CORPORATION,**
**Petitioner,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Respondents,**

**Grocery Manufacturers of America, Inc., et al., Intervenors.**

**No. 75–2089.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 10, 1976.

Decided April 1, 1977.

Rehearing Denied April 22, 1977.

Certiorari Denied Nov. 14, 1977.
See 98 S.Ct. 479.

---

3. *See Sangamon Valley Television Corp. v. United States*, 106 U.S.App.D.C. 30, 43, 269 F.2d 211, 224 (1959).

John A. Daily, Philadelphia, Pa., with whom Leo C. Franey, Washington, D. C., was on the brief, for petitioners and intervening railroads.

Lloyd John Osborn, Atty., Dept. of Justice, Washington, D. C., with whom Barry Grossman, Atty., Dept. of Justice, Washington, D. C., was on the brief, for respondent United States of America.

Frederic L. Wood, Jackson, Mich., with whom John F. Donelan and John M. Cleary, Washington, D. C., were on the brief, for intervenor.

Arthur J. Cerra, Gen. Counsel I.C.C., Charles H. White, Jr., Associate Gen. Counsel I.C.C., Washington, D. C., were on the brief for respondent I.C.C.

Leo C. Franey and John A. Daily entered appearances for the following intervenors, Illinois Central Gulf Railroad Company, Chicago Rock Island, et al. and the Florida East Coast Railway Company, Chicago and North Western Transportation Company and Consolidated Rail Corporation.

Before WRIGHT and ROBB, Circuit Judges, and GESELL,* District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by District Judge GESELL.

Dissenting Opinion filed by Circuit Judge WRIGHT.

GESELL, District Judge:

In a special rulemaking proceeding, the Interstate Commerce Commission has determined that there exists a national shortage of epoxy-lined ("XF") boxcars and has required railroads using another line's XF cars to make incentive per diem ("IPD") payments to their owners.[1] Petitioner, Consolidated Rail Corp. ("Conrail"), asserts that there is not sufficient evidence in the record to support the shortage finding, which is a prerequisite to the imposition of the additional, incentive, payments. 49 U.S.C. § 1(14)(a). We affirm the Commission.[2]

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. *Incentive Per Diem Charges–1968 (XF Cars)*, 350 ICC 11 (1975).

2. We find on the record substantial evidence to support the Commission's findings and do not reach the issue whether a lesser evidentiary showing would suffice. *See* Judge Wright's opinion at p. —— of 185 U.S.App.D.C., p. 68 of 567 F.2d, n.3 *infra*.

According to the Commission, the transportation of processed foods in ordinary boxcars presents serious risks of contamination. Ordinary boxcars ("XM") are often infested with insects and rodents from the cargoes they carry. Processed food at the present time is carried predominantly in "class A" XM boxcars, which are ordinary cars that have been cleaned and inspected. The Commission has determined that these sanitizing procedures are insufficient. The visual inspection carried out for class A designation cannot detect any infestations between car walls, and the quality of such inspections varies. Further, it is possible for non-visible contaminants to later be introduced into the car. Thus, the Commission found that only the XF boxcars are sufficiently sanitary for the transportation of processed food, since the white epoxy lining prevents contaminants between the car walls from reaching the food.

The Commission's finding of a shortage was based on evidence that 750,000 carloads of processed food are shipped annually, requiring a nation-wide fleet of 40,000–50,000 suitable cars. Since it has determined that only XF cars are suitable, and evidence indicated that only about 3,000 such cars exist, the Commission found a clear national shortage. IPD was thus imposed with the expectation that this would encourage the acquisition of XF boxcars.

Petitioner contends that there is no evidence of an XF boxcar shortage because there was no evidence that any processed food shipper had requested an XF car and not received one. It also claims that the Commission did not meet its own previously established criteria for the imposition of IPD.

■ Conrail assumes that there can be no finding of boxcar shortage under the statute unless there is a record of shipper complaints. However, in determining the existence of a shortage the Commission may certainly consider the public interest as well as the interests of shippers. IPD may be imposed to "encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce . . . ." 49 U.S.C. § 1(14)(a). We cannot define the needs of commerce so narrowly as to exclude the need of consumers for uncontaminated, infestation-free food.[3] There certainly is sufficient evidence on the record to support the Commission's determination that the public's needs are best served by the use of XF cars.[4]

■ It is clear that, as petitioner asserts, the Commission did not compile as elaborate a statistical record in the XF boxcar proceeding as it did in prior proceedings.[5] But as Judge Wright notes,[6] it would not have been possible for the Commission to generate such a record due to the recent development of the XF classification. The need to depart from previous procedures is adequately explained by this situation. *See, e.g., Greyhound Corp. v. ICC*, 179 U.S. App.D.C. 228, at 230–231, 551 F.2d 414, 416–417 (1977).

■ The dissent, however, after an exhaustive examination of the legislative history of this statute, concludes that IPD can be imposed only where boxcar shortages are caused by the tendency of some railroads to hold cars owned by other lines. It says, in essence, that this section of the statute was aimed only at inefficient car utilization practices. However, the statutory delegation of power goes far beyond this limited field:

> It is the intent of Congress to encourage the purchase, acquisition and efficient

---

3. We also note that the Commission may establish car service rules, after hearings, on its own initiative as well as after a complaint. 49 U.S.C. § 1(14)(a).

4. That the result may also be achieved, as the dissent suggests, by alterations in other car service rules is beside the point. Those determinations are left to the Commission.

5. *See Incentive Per Diem Charges–Gondolas*, 40 Fed.Reg. 44851 (1975); *Incentive Per Diem Charges–1968*, 349 ICC 303 (1975).

6. P. —— of 185 U.S.App.D.C., p. 73 of 567 F.2d n.26 ¶ 2 *infra*.

utilization of freight cars. * * * In determining the rates of compensation to be paid for each type of freight car, the Commission shall give consideration to the transportation use of each type of freight car, to the national level of ownership of each such type of freight car, and to other factors affecting the adequacy of the national freight car supply. * * * Such compensation may be increased by any incentive element which will . . . provide just and reasonable compensation to freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce . . . . 49 U.S.C. § 1(14)(a).[7]

We do not think the Court should rewrite this broad delegation by reference to the legislative history. It is too clear from the statute on its face that inefficient car utilization and distribution is but one of the permissible grounds for the imposition of incentive payments.

The Commission here has acted within its grant of statutory authority, and with substantial evidence to support its actions. The Commission is affirmed.

7. The statute currently reads as quoted, having been amended by § 212(a) of the Railroad Revitalization and Regulatory Reform Act of 1976 (P.L. 94–210, Feb. 5, 1976). See Judge Wright's opinion p. —— of 185 U.S.App.D.C., p. 68 of 567 F.2d n.6 for the text at the time the ICC decision in this case was made.

1. Imposition of incentive per diem is by no means the only regulatory approach open to the Commission. It can order railroads which serve food shippers to provide the necessary XF cars. See Illinois Terminal R. Co. v. United States, 541 F.2d 201, 206 & n.7 (8th Cir. 1976). In some circumstances, it can condition tariff increases on earmarking of additional revenues for purchase of sanitary equipment. See United States v. Chesapeake & Ohio R. Co., 426 U.S. 500, 96 S.Ct. 2318, 49 L.Ed.2d 14 (1976). Finally, it can change car service rules to prevent loading of contaminants into cars otherwise suitable for food transportation. See 49 U.S.C. § 1(14)(a) (1970), as amended by Pub.L. No.94–210, § 212(a), 90 Stat. 46–47 (1976). The only course which it may not adopt is to act without authority and without a proper record, no matter how indisputably beneficial its goals may be. See Hampton v. Mow Sun

J. SKELLY WRIGHT, Circuit Judge, dissenting:

This case has been argued by the Interstate Commerce Commission and the Justice Department as though the health of the American public would be gravely affected by its outcome. Were this true, I would find it difficult to lodge a dissent. But in fact the health of the nation is not at stake here because no matter how this case is decided the Commission will have ample power to create a fleet of sanitary freight cars, if indeed such a fleet is needed.[1] What is at issue here is the proper interpretation of a sliver of the Commission's overall regulatory authority.[2] Specifically, what must be decided today is whether there is a need for a fleet of white, epoxylined boxcars and, if so, whether the cost of creating this fleet should be borne in part by railroads which terminate food shipments. By its imposition of incentive per diem ("IPD") on XF boxcars, the Commission has decided both these issues and has opted for an increased car fleet and for putting much of the burden of paying for this fleet on terminating railroads, even though this group is predominantly made up of bankrupt eastern railroads which now

Wong, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976).

2. The majority's characterization of the incentive per diem statute as a "broad delegation," majority op. at 5, 567 F.2d at 66, is misplaced. While the language of the incentive per diem provisions may be broad, its sweep must surely be tempered by the rather narrow office of the car service provisions in the overall scheme of the Interstate Commerce Act. Moreover, there is no evidence in the legislative history of the incentive per diem provisions which would indicate that Congress intended to grant a sweeping authority. Indeed, the House Report accompanying the bill which became the amending legislation specifically states that there was no evidence that the incentive per diem scheme would even work. See H.R.Rep.No.1183, 89th Cong., 1st Sess. 2–3 (1965), U.S.Code Cong. & Admin.News 1966, p. 2227. See also H.R.Rep.No.1384, 92d Cong., 2d Sess. 20 (1972) ("incentive per diem as presently structured is not working. It is neither an effective incentive to return cars nor to buy new ones.").

comprise the Government-supported Conrail system.

While the Commission's action might be affirmed on a proper record, I do not agree with the majority that the record we have been presented in this case is satisfactory.[3] My objections are twofold. First, unlike the majority, I cannot conclude that the XF car is the only type of car suitable for the sanitary transportation of food. Therefore, although the record clearly supports the need for some 40,000 to 50,000 sanitary vehicles, I conclude that it does not support the need for equal numbers of XF cars. My principal disagreement with the majority, however, is over the definition of the shortage finding which the Commission must make before it can impose incentive per diem.[4] With all due respect, I do not think the meaning of the statutory language is "plain," but even if it is, the Supreme Court has recently reminded us:

" 'When an aid to construction of the meaning of words, as used in a statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear * * *.' " *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976), *quoting United States v. American Trucking Ass'ns,* 310 U.S. 534, 543–544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).[5] Once the history of the incentive per diem provisions is examined, the meaning of the statute becomes relatively clear, but in my judgment that meaning is rather different from that accepted by the majority. For this reason, I respectfully dissent.

## I. BACKGROUND

In order to understand the incentive per diem scheme authorized by Section 1(14)(a) of the Interstate Commerce Act,[6] it is nec-

---

**3.** The proper standard of review of the record in a proceeding such as this is a matter of some dispute. In *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972), the Supreme Court appeared to require substantial evidence on the record as a whole. *See* 406 U.S. at 753, 92 S.Ct. 1941. One year later, however, the Court ruled in *United States v. Florida East Coast R. Co.,* 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), that the "hearing" requirement was not the full hearing envisioned for adjudications under the Administrative Procedure Act, but could generally be satisfied by procedures required for rulemaking. Since the substantial evidence test does not, under the Administrative Procedure Act, apply to the latter procedures, *see* 5 U.S.C. § 706(2)(E) (1970), it is unclear where the matter stands today. On remand in *Florida East Coast,* the three-judge District Court concluded that substantial evidence was still required. *See Florida East Coast R. Co. v. United States,* 368 F.Supp. 1009, 1014–1015 (M.D. Fla. 1973) (three-judge court), *aff'd,* 417 U.S. 901, 94 S.Ct. 2595, 41 L.Ed.2d 207 (1974). A contrary view was apparently taken by another three-judge District Court in *Ann Arbor R. Co. v. United States,* 368 F.Supp. 101, 112 (E.D. Pa. 1973), *aff'd per curiam,* 419 U.S. 807, 95 S.Ct. 23, 42 L.Ed.2d 36 (1974). Both District Court cases have been affirmed by the Supreme Court. Because I find either that the record is devoid of any evidence to support the Commission or that the evidence adduced indicates that the Commission has abused its discretion, I do not reach the scope of review issue.

**4.** "The Commission shall not make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate * * *." 49 U.S.C. § 1(14)(a) (1970).

**5.** If anything is plain, it is the error of the Commission's interpretation of its authority under § 1(14)(a) of the Interstate Commerce Act, 49 U.S.C. § 1(14)(a). Even the Commission's counsel in brief in this very case appears to agree that § 1(14)(a) is intended to deal with the ills of the national car-pool system. *See* br. of ICC at 1–6. To be sure, Commission counsel has not carried the logic of this position through to its end: that this purpose requires a record which shows the ills of the national car-pool system to be an aggravating factor in shortages of cars upon which IPD is imposed. However, in other proceedings, which bracket the rulemaking reviewed here, the Commission has itself recognized that evidence of such aggravating factors is required before IPD can properly be imposed. *See* text at notes 62 to 63 *infra.* I argue for no more.

**6.** At the time of the Commission's decision in this case, this section read as follows:

(a) The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle not

essary to consider in some detail railroad practices governing interline shipments of freight. In the early days of railroading, freight was physically transferred between the cars of connecting railroads whenever delivery was required at a destination not served by the originating road. By agreement among the railroads, this custom was superseded by the practice of interchanging loaded cars from the originating line to the lines of various connecting carriers without disturbing the car's lading. With the passage of the Interstate Commerce Act, connecting roads became obliged to accept cars from other roads whenever a through route had been established.[7]

The tariff paid by a shipper for a multiline haul is divided among the carriers who participate in a car's movement. The expense associated with use of the freight car is similarly allocated among the participants through the mechanism of "per diem" payments made by each non-owning partici-

pant to the owning line.[8] The amount of the per diem payment is intended to approximate the cost a non-owning participant would have incurred if the freight had been shipped over its lines in one of its own cars.[9] As a result of these transfer payments among the participating roads, the net revenue each participant receives approaches what it would have been had freight been physically transferred from car to car at junction points.

Once unloaded, further movement of a car in interchange service is controlled by a series of car service rules, which have traditionally been promulgated by the Association of American Railroads but some of which are now established by the Commission.[10] In general, a connecting road is under an obligation to load an unowned ("foreign") car before one of its own if a shipment is available which would take the car in the direction of its owner.[11] If no

---

owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for nonobservance of such rules, regulations, or practices. In fixing such compensation to be paid for the use of any type of freight car, the Commission shall give consideration to the national level of ownership of such type of freight car and to other factors affecting the adequacy of the national freight car supply, and shall, on the basis of such consideration, determine whether compensation should be computed solely on the basis of elements of ownership expense involved in owning and maintaining such type of freight car, including a fair return on value, or whether such compensation should be increased by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense. The Commission shall not make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate and may exempt from the compensation to be paid by any group of carriers such incentive element or elements if the Commission finds it to be in the national interest.
49 U.S.C. § 1(14)(a) (1970). This section was amended in 1976, Rail Reorganization Act Amendments of 1976, Pub.L.No.94–210, § 212(a), 90 Stat. 46–47 (1976). The present

text of this section is set out in the majority opinion at page 5, 567 F.2d at 66. Except as noted in Part IV *infra*, the 1976 amendment has no bearing on this case.

**7.** *See generally Chicago, B. & Q. R. Co. v. New York, S. & W. R.R.*, 332 ICC 176, 183–185 (1968) (hereinafter *Per Diem Report*), *aff'd, sub nom. Union Pacific R. Co. v. United States*, 300 F.Supp. 318 (D.Neb.) (three-judge court), *aff'd, sub nom. Boston & Maine R.R. v. United States*, 396 U.S. 27, 90 S.Ct. 196, 24 L.Ed.2d 142 (1969).

**8.** Per diem payments are made to the owning line even if it does not participate in a car's interline movement.

**9.** *See Per Diem Report, supra* note 7, 332 ICC at 186.

**10.** Section 1(14)(a) gives the Commission authority to establish reasonable rules affecting car service. *See* note 6 *supra*. This authority has recently been exercised to promulgate rules governing the return of cars. *See* 49 C.F.R. §§ 1033.0–1033.19 (1976); *United States v. Allegheny-Ludlum Steel Corp., supra* note 3.

**11.** *See Hearings on S. 179 and S. 1098 Before the Freight Car Storage Subcommittee, Committee on Commerce*, 89th Cong., 1st Sess. 12 (1965) (statement of Charles A. Webb, ICC Chairman).

shipment is available, the car can be returned empty. Per diem is assessed, apparently with limited exceptions, on each day that a car is off its owner's lines, regardless of whether a non-owning line is carrying out its statutory obligation to terminate a through shipment, is using the car to meet the needs of its shippers, or is simply allowing the car to stand idle.[12]

As a result of the interchange, per diem, and car service rules, freight cars have in effect been put into a national pool upon which any road is free to draw (and, indeed, may be obligated to draw)[13] to meet the needs of its shippers. The car-pool system, by removing any need to shift freight from car to car at junction points and by minimizing the number of unloaded car movements, has led at least in theory to a very efficient use of rolling stock.[14] In practice, however, the system has been flawed and, in the Commission's longstanding view, has contributed to nationwide shortages of freight cars. In the words of the Supreme Court:

> The Commission concluded that one of the principal factors causing [the] inadequate supply of freight cars was the operation of the national car-pool system. In practice this system resulted in freight cars being on lines other than those of the owning road for long periods of time, since the rules providing for the return of unloaded freight cars in the direction of the lines of the owning road were observed more often than not in the breach. Since the owning road was deprived of the use of its own freight cars for extended periods of time, the Commission found, there was very little incentive for it to acquire new freight cars. In addition, since a road which owned a supply of freight cars inadequate to serve its own on-line shippers could generally, by hook

or by crook, arrange to utilize cars owned by other roads, the national car-pool system significantly reduced the normal incentive for a railroad to acquire sufficient equipment to serve its customers.

*United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 745, 92 S.Ct. 1941, 1945, 32 L.Ed.2d 453 (1972); *see Increased Per Diem Charge on Freight Cars,* 268 ICC 659, 670 (1947).

The Commission first attempted to use an increased per diem charge as a regulatory tool to correct the car shortage problem in 1947. *See generally Increased Per Diem Charge on Freight Cars, supra.* At that time, the Commission found that connecting lines were holding cars unloaded after interchange service for what were in its view unjustifiably long periods of time.[15] By penalizing the holding of cars through an increase in the per diem charge from $1.25 to $2.00, the Commission hoped to spur prompt car movement in an effort to decrease shortages by increasing the number of revenue trips a single car could make in any given time period.[16] The $2.00 penalty per diem was short-lived, however. In *Palmer v. United States,* 75 F.Supp. 63 (D.D.C.1947) (three-judge court), the order establishing the new rate was set aside on three grounds. First, it exceeded the Commission's authority under Section 1(14)(a) as it was then written. *Id.* at 67. Second, there was no factual evidence that the increase in per diem would increase car utilization during periods of shortage. *Id.* at 70–71. Finally, increased per diem, because it applied without regard to the use being made of a foreign car, was a tool so unrelated to the specific problems to be rectified that its use as a regulatory device raised serious questions of irrationality. *Id.* at 68.[17]

**12.** *See* note 17 *infra.*

**13.** *See* text at note 11 *supra.*

**14.** *See Hearings, supra* note 11, at 33 (statement of ICC Chairman Webb).

**15.** *Increased Per Diem Charge on Freight Cars,* 268 ICC 659, 662–663 (1947), *vacated, Palmer*

*v. United States,* 75 F.Supp. 63 (D.D.C.1947) (three-judge court).

**16.** *See id.* at 661, 674.

**17.** The legislative history of the 1966 amendment to § 1(14)(a) reveals that the difficulties with the use of incentive per diem as a tool to enhance car utilization and ownership still re-

Shortly after *Palmer* the Commission sought enactment of amending legislation that would give it authority to impose per diem above levels needed for fair compensation as a regulatory measure intended to enhance car utilization in times of shortage.[18] Rather than proposing to amend Section 1(14)(a), however, the Commission sought legislation to amend Section 1(15)[19] of the Act, a section allowing the Commission to correct short-term emergency conditions on the nation's railroads. Beginning with its Annual Report for 1957, the Commission proposed to amend Section 1(14)(a) as an alternative to Section 1(15). Either measure would apparently have met the Commission's primary requirement of an incentive for rapid release of foreign cars. *See,* ICC, Seventy-First Annual Report 137

(1957). In addition, the amendment to Section 1(14)(a) was thought to have a beneficial effect on car ownership since it would include as an element of per diem "the earning power or the value of the use of the vehicle which is lost by the owner when used or appropriated by other carriers [thereby eliminating] the owner's loss [and] the user's gain  *  *  *." *Id.* Although legislation had been introduced in Congress in many of the years since the *Palmer* decision, it was not until 1959 that a bill was favorably reported out of committee. That bill[20] was not enacted, although the Senate Commerce Committee's rejection of alternative bills which would have modified Section 1(15) apparently caused the Commission to drop its advocacy of an amendment to that section.[21] Continued and height-

main. For this reason, it is useful to consider *Palmer's* succinct statement of the problem:

[T]he per diem charge applies every day a foreign car is on a railroad. It applies whether the car is moving as expeditiously as possible, or is standing still; whether it is in the hands of a consignee for unloading, of a shipper for loading, or is under control of the railroad; whether it is awaiting bottoms for export or is being held by the railroad for expected freight.  *  *  *

*  *  *  *  *  *

*  *  * [P]er diem  *  *  * has no relation to avoidable delay or to inefficiency. It is payable for every day a foreign car is on the line.  *  *  * The per diem charge, in so far as it penalizes, penalizes use and non-use, efficient and inefficient use, unavoidable and avoidable delays, alike. It would be deemed arbitrary as a regulatory measure under the established rules of law.

But the decisive consideration is the essential nature of the thing which is proposed to be done here. The car situation involves conflicting economic interests of considerable moment. There is the conflict between the great trunk lines, which are organized and able to own large numbers of cars, and the smaller and shortline roads, unable or unequipped to own many cars.  *  *  * There is also the conflict between a car owner's interests in restricting its cars to its own lines for its own purposes, and the general interest of the nation in through traffic, with its necessary free interchange of cars. There is the conflict between the economic waste of moving large numbers of empty cars from the unloading areas back to the proprietary lines at certain periods of the year, and the economic efficiency of using unloaded foreign cars for the immediate movement of

freight awaiting shipment at the points of unloading. The Commission has insisted that the extensive movement of empty cars is an economic waste to be avoided.

The Commission does not propose by the pending order to solve these problems by regulations directly addressed to them, but actually the order cuts across all these complex difficulties. If the order results in the prompt return of emptied foreign cars to the owners, regardless of available freight in that direction, it will decide the economic balance between movement of empties and the movement of freight in favor of the former. If the order does not cause hiring roads to release the cars, it will merely transfer tremendous sums of money from non-owners to owners, making the economic status of many non-owners difficult, if not unbearable.  *  *  * *Palmer v. United States, supra* note 15, 75 F.Supp. at 67, 68–69.

18. *See* ICC, Sixty-Fourth Annual Report 128 (1950). The Commission's legislative recommendation was repeated in every Annual Report through 1966.

19. 49 U.S.C. § 1(15) (1970).

20. S. 1789, 86th Cong., 1st Sess., *printed in* S.Rep.No.452, 86th Cong., 1st Sess. 11 (1959).

21. The Senate took the position that the measures proposed under § 1(15) were too punitive, and it therefore rejected that approach in favor of the incentive approach. *See* S.Rep.No.452, *supra* note 20, at 6–7. In the first ICC Annual Report following this Senate action, the legislative recommendation to amend § 1(15) was dropped without comment. *See* ICC, Seventy-Fourth Annual Report 183–184 (1960).

ened freight car shortages and dogged persistence by the Commission finally brought amending legislation in 1966.[22]

Having struggled for almost 20 years to gain authority to impose IPD, the Commission in 1967 reversed course and refused to promulgate IPD regulations because it found no evidence that any freight cars were in short supply. *Incentive Per Diem Charges,* 332 ICC 11 (1967). After a dressing down by the Senate Subcommittee on Surface Transportation,[23] the Commission reversed itself again and imposed IPD on general-purpose, unequipped boxcars ("XM boxcars"). Under the scheme adopted, IPD rates vary according to the original costs and the age of cars used by a non-owner. 49 C.F.R. § 1036.1 (1976). IPD credit balances net of taxes and payments to other roads must be segregated by each carrier in separate financial and bank accounts. *Id.* § 1036.3. These funds are then earmarked for purchase of freight car equipment of the types to which IPD applies. *Id.* § 1036.4. If the funds are not expended within 18 months, they may be "voluntarily surrendered" to the cooperative American Rail Boxcar Company for use in equipment acquisition. *Id.* It is not clear what happens to funds which are neither spent nor "voluntarily surrendered" for investment in the car fleet. At the present time, IPD is imposed on XM boxcars only during six fall and winter months when boxcar shortages are the most acute.[24]

## II. THE DECISION TO IMPOSE IPD ON XF BOXCARS

The Commission decision reviewed here originated in response to a petition filed by General Mills, Inc. (GMI) in one phase of the continuing XM boxcar proceeding. GMI alleged that owners of boxcars designated XP and XF were reclassifying these cars as XM boxcars in order to take advantage of the increased returns made possible by IPD on the XM cars.[25] *See generally Incentive Per Diem Charges—1968,* 349 ICC 303, 306 (1975); comments of GMI, JA 29. As a result, GMI, which uses XP and XF boxcars to transport its considerable shipments of processed foodstuffs, feared that this rolling stock would become contaminated with insects or rodents or that it would be supplied XM cars, many of which were already infested with insects or rodents. In either case GMI would be forced to undertake extensive cleaning operations before infested cars could be used to transport foodstuffs and might have to use pesticides to control contamination. Because pesticide use would have adverse environmental consequences, GMI alleged, the Commission had no choice other than to include XP and XF cars in the IPD system or to file an environmental impact statement. Rather than deciding this issue in the context of the XM proceeding, the Commission instituted an additional rulemaking proceeding which culminated in a report, *Incentive Per Diem Charges—1968 (XF Cars),* 350 ICC 11 (1975) (hereinafter *XF Report*), which concluded that XF cars were in short supply and that they should be included within the existing IPD scheme.

The XF car designation was introduced in 1973. It indicates that a boxcar is equipped with a white epoxy inner coating and it can only be used by shippers of non-contaminating food products. *See XF Report, supra,* 350 ICC at 13. The XF designation was intended to replace the XP designation, which had been applied to plain, unequipped

---

22. Pub.L.No.89–430, 89th Cong., 2d Sess. § 1, 80 Stat. 168 (1966).

23. *See United States v. Florida East Coast R. Co., supra* note 3, 410 U.S. at 232–233, 93 S.Ct. 810.

24. *See Incentive Per Diem Charges—1968,* 350 ICC 464 (1975).

25. The record does not support GMI's allegation, however. Although other participants before the Commission made allegations similar to that of GMI, no proponent of this view supplied any data to support its position. The only data in the record shows that XF car stocks increased throughout the period when IPD was applied to XM cars. *See* comments of Erie Lackawanna Railroad, JA 20–21 (317 cars upgraded to XF status during this period); comments of Union Pacific Railroad, JA 104 (96 cars upgraded to XF status during this period).

boxcars used by both the food and automobile industries and generally not equipped with the epoxy lining. *Id.* In either case the designation indicates a high quality boxcar which, under applicable car service rules, cannot be used for carriage of contaminating cargoes. *Id.* At oral argument we were advised that conversion of an XP or XF car to the XM designation requires no physical modification of the car at all, but involves only repainting the identifying numbers on the side of the car and some associated paperwork.

According to the Commission, only the XF car can adequately protect the sanitation of processed package foods. *XF Report, supra,* 350 ICC at 18–19. It appears that the epoxy inner lining of the XF car prevents any rodents or insects which might be nesting between the outer and inner walls of the boxcar from gaining access to the food inside the car. As a result in-transit contamination of food shipped in containers which rodents or insects might otherwise penetrate is reduced or eliminated altogether. By contrast, the "class A" XM car traditionally used for carriage of processed packaged foods has clear disadvantages. *See id.* at 18. This car is no more than a regular XM boxcar to which the "class A" designation is attached once it has been cleaned and inspected to eliminate unsanitary conditions. In practice, the visual inspection upon which class A status is based is said to be inadequate because such

an inspection will not detect infestation between the walls of an XM car and because the quality of visual inspections varies widely from inspector to inspector. In addition, because XM cars are free-running, *i. e.,* they may be used by any shipper regardless of the type of freight it proposes to load, it is possible that contaminants will be introduced which are not detectable by visual inspection but which can nonetheless taint subsequent loads of processed foods.

Given its conclusion that only XF boxcars are suitable for transportation of processed food products, the Commission takes the further position that the existence of a shortage of XF cars "is amply demonstrated by the prevalent use of the so-called class 'A' boxcars in transporting shipments of food products." *Id.*

It is this further conclusion that is challenged by Conrail, primarily because the Commission has not cited even one instance where a food shipper has asked for, but has not received, an XF car, and because there is no such instance reported in the comments in this proceeding. Conrail also challenges what it perceives to be an inconsistency between the standard of proof of shortages required by the Commission in other incentive per diem cases and the sparse record in this proceeding. The majority has rejected both of these contentions, as do I.[26] However, I agree with Conrail that at most the record evidence supports the need for Commission regula-

---

26. I agree with the majority that, were we to hold today that IPD could not be imposed except on a record of shipper complaints, important interests such as that in sanitary food would be put at risk since there is no reason to suppose that the interests of shippers and of the public will necessary coincide. However, I find it at least troubling, as the majority apparently does not, that the record here is completely devoid of evidence of shipper complaints since the moving parties in this proceeding have been GMI and the Grocery Manufacturers' Association, both groups which would be in a position to know of shipper complaints.

ʹI agree with Conrail that the Commission has departed from contemporaneously announced standards of proof with respect to statistical evidence of car shortages. *See, e. g., Incentive Per Diem Charges—1968,* 349 ICC 303, 311

(1975); *Incentive Per Diem Charges—Gondolas,* 40 Fed.Reg. 44851, 44851–44852 (1975). This departure is not unexplained, however. The Commission has stated that creation of the XF car classification only one year before its inquiry into imposition of IPD prevented creation of an elaborate statistical record of shortages. *Incentive Per Diem Charges—1968 (XF Cars),* 350 ICC 11, 17 (1975) (hereinafter *XF Report* ). Conrail does not appear to challenge this statement and has cited no authority which would require the Commission to defer action on IPD until adequate statistics can be generated. Therefore, it appears that the Commission was acting within its permitted discretion when it chose to examine the shortage question on the basis of whatever record could be generated given the relative newness of the XF classification.

tions dealing with car cleaning and loading of contaminating products. I turn to this first before setting out my broader objections to the Commission's overall statutory authority to proceed as it has here.

### III. THE ADEQUACY OF THE COMMISSION'S SHORTAGE FINDING

The Commission's position can be summarized as follows: (1) there are approximately 750,000 carloads of processed food shipped yearly;[27] (2) a single car can make about 15 to 18 trips per year;[28] (3) consequently there is a need for some 40,000 to 50,000 cars suitable for food shipment; (4) only the XF car is suitable for food transportation; (5) therefore, there is a need for some 40,000 to 50,000 XF cars *versus* a supply of under 3,000 (or of under 35,000 if XP cars are included);[29] hence, (6) the statutory shortage requirement is met.[30] In my judgment, the fourth step of the Commission's analysis cannot be sustained on the record it has made in this proceeding.

Initially, it is interesting to note that William K. Smith, GMI's vice-president for

transportation and the moving party in these proceedings, stated, contrary to the Commission's conclusion, that GMI uses successfully DF, DFB, and XM cars.[31] To be sure, all of GMI's cars are in assigned service [32] and this may account for its ability to use cars other than those of XF design. This concession only highlights a further difficulty with the Commission's argument, however. Stated precisely, the Commission's proposition four is that "the function of XF cars cannot, *under present car service rules*, be adequately performed by other cars available for the transportation of food shipments." *XF Report, supra,* 350 ICC at 10 (emphasis added). The italicized phrase in this proposition is critical. As the Commission clearly recognized, existing car service rules allow continual reintroduction of contaminants into class A XM boxcars. Thus it is scarcely surprising that XM cars, regardless of car design, are given to food shippers in less than desirable condition. Indeed, unless XF cars can be assigned to non-contaminating uses, the Commission found that they too would have to be fumi-

27. Comments of GMI, Exhibit 17, at 9, JA 68 (verified statement of Daniel G. McPherson, GMI vice-president).

28. *Id.,* Exhibit 16, at 9, JA 53 (verified statement of William K. Smith, GMI vice-president for transportation).

29. XP cars were used for food transportation prior to creation of the XF designation. *See* p. 13 *supra,* 567 F.2d at 72. At the time of the Commission's report there were 2,495 XF cars and 29,075 XP cars. *XF Report, supra* note 26, 350 ICC at 17.

30. Conrail has not challenged the figures in text; however, it has challenged the inference which should be drawn from them, noting particularly that William K. Smith, GMI's vice-president for transportation and apparently the person whose testimony launched the XF proceeding, did not conclude from these figures that IPD was needed on XF cars except to prevent reclassification of XF cars to XM. Were such reclassifications prevented, GMI would apparently have been satisfied and would not have pressed for IPD simply to increase the size of the XF car fleet. *See* Comments of GMI, JA 35. As has already been noted, *see* note 25 *supra,* there is no evidence that GMI's fears of losing its XF fleet were well founded. To the contrary, the record so far as it shows anything indicates that railroads serv-

ing food shippers were ready and able to supply the needed cars. *See* Comments of Grand Trunk Western, JA 6 ("The Grand Trunk Western Railroad Company plans to expand the use of 'XF' box cars for use by the cereal industries over our lines."); Comments of Erie Lackawanna, JA 20–21 ("This company knows of no facts which would lead us to the conclusion that there is a national shortage of XF cars. * * * Erie Lackawanna has upgraded some 317 box cars between December 1973 and August 1974 at great expense to create the status of an XF car * * *."); Comments of Union Pacific, JA 104 ("Union Pacific, when approached by food processing companies, has satisfied all specific requests for the provision of [XF] cars."); Comments of Florida East Coast, JA 127 ("[A] survey during the month of July 1974 shows that FEC had a surplus of XF cars on line.").

31. Comments of GMI, Exhibit 16, at 7, JA 51. The Commission reported that GMI also used XL cars. *Environmental Threshold Assessment Survey,* JA 155.

32. In assigned service, cars are restricted as to the use terminating roads may make of them. Assigned service is discussed at length below. *See* text at notes 41–52 *infra.*

gated and decontaminated notwithstanding their white epoxy coating. *Id.* at 15. This illustrates a key fact about XF cars. They are desirable because they can be assigned to a restricted service in which the "primary source of contamination, *i. e.,* grain and related products and other unsanitary bulk commodities, [is] banned * * *." *Id.* at 19.

The record further suggests that there is nothing inherently unsanitary about the XM car. The problem with these cars arises only after rodents and insects infest their inner walls. All parties agree that such infestation is not present in the car at the beginning of its life, but is caused by introduction of bulk feeds, grains, and similar loose, life-supporting products into the XM car. *See XF Report, supra,* 350 ICC at 13; ICC *Environmental Threshold Assessment Survey,* JA 156, 162; comments of GMI, Exhibit 16, at 10, JA 54 (testimony of Mr. Smith). *See also* br. for the United States at 8. Indeed, it appears that the XP boxcar, which unlike the XF did not initially have an epoxy coating and was therefore substantially identical to an XM car, was successfully used by processed food shippers in assigned service for a number of years prior to creation of the XF designation. *See XF Report, supra,* 350 ICC at 13; comments of GMI, Exhibit 17, at 4, JA 63; comments of General Foods Corp., JA 146. The success of the XP car as a sanitary vehicle is apparently due not to its intrinsic design, therefore, but only to the fact that its restriction to assigned service prevents introduction, or repeated reintroduction, of contaminating cargoes into the car.

The record in this proceeding thus strongly indicates that the scarcity of sanitary cars is due to the absence of a classification for food-quality boxcars of whatever design which would allow their assignment and control in a manner like that established for XF cars by Association of American Railroads Car Service Directive 155.[33] The presence or absence of a white epoxy lining, on the record here, is beside the point. Ac-

cordingly, the actual regulatory problem faced by the Commission is a false scarcity of food-quality cars created by car service rules which allow continual reintroduction of contaminants into cars cleaned for food service.

There can be no doubt that the Commission recognized the crucial interplay between sanitation and car service rules, for it reversed its initial proposal to put XF cars in general service [34] once it became aware that such use would defeat the whole XF car program. Apparently the Commission, determined to go forward with IPD, never did become aware that the record before it indicated that XM cars could similarly be made suitable for food transportation through reclassification to a restricted service. If it had become aware of this, it might have exercised its undoubted authority [35] to create an assigned service for high quality XM cars. Had it done so, there would likely be no scarcity of sanitary vehicles requiring the corrective powers of IPD.

Given this state of facts, I think the Commission has failed to give adequate consideration to all relevant factors and has further stopped short of giving the record the hard look essential to an exercise of informed discretion. Accordingly, I would vacate the rules imposing IPD on XF cars. By this, I do not mean to imply that the Commission must modify car service rules before it can apply IPD. The Commission plainly enjoys discretion to proceed by promulgation of rules, imposition of IPD, or a combination of approaches. It may not, however, impose IPD because a scarcity of a particular type of car has been generated primarily by the very car service rules which the Commission is empowered to change until it has at least considered whether a seemingly simple car service rule modification would alleviate the shortage.

## IV. STATUTORY AUTHORITY TO IMPOSE IPD

As indicated above, the commission has in my judgment failed to make out a case for

---

**33.** *See* note 41 *infra.*

**34.** *See Notice of Proposed Rulemaking and Order,* JA 2.

**35.** *See, e. g., United States v. Allegheny-Ludlum Steel Corp., supra* note 3.

imposition of IPD on XF cars even assuming its proffered syllogism adequately implements the statutory scarcity requirement. My primary objection to what the Commission has done here goes beyond this, however, for it seems to me that the Commission has stepped beyond the bounds of its authority under Section 1(14)(a) of the Act.

Section 1(14)(a) as amended in 1966 allows IPD to be imposed only if the Commission finds *both* that a shortage of a particular type of car exists and that incentive elements are necessary to "provide just and reasonable compensation to freight car owners, contribute to sound car service practices * * *, and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce * * *." [36] It is easy to understand how all of the latter objectives would be met if the national car-pool system were malfunctioning as described in Part I *supra*. Any increase in per diem would presumably provide an incentive to railroads to return foreign cars which they were not using and would thereby "contribute to sound car service practices." [37] Such an effect is inherent in any time charge, whether for railroad cars, library books, or bulldozers. In addition, because incentive per diem is by definition an increment above basic per diem—the "expense involved in owning and maintaining [any given] type of freight car, *including a fair return on value*," 49 U.S.C. § 1(14)(a) (emphasis added)—over the long run it would be advantageous to users of foreign cars to build cars of their own so that, by incurring ownership costs roughly equal to basic per diem,[38] they might avoid the higher sum of basic per diem and incentive per diem.

Given the definition of basic per diem in Section 1(14)(a) to include a fair return on value, it also becomes clear that the "just and reasonable compensation to freight car owners" for which IPD can be instituted must be something other than "fair return" on money invested. That something else, according to the Commission, is a return to compensate "for the earning power or the value of the use of the vehicle which is lost by the owner when [a car is] used or appropriated by other carriers." ICC, Seventy-First Annual Report, *supra*, at 137.[39] Because the average daily revenue which accrues to a car in use is well above basic per diem,[40] the owner who cannot use his car and who, because of nation-wide shortages, has no other cars on-line to put into revenue service loses more net revenue than he gains by receiving basic per diem. Thus when a non-owning road, "by hook or by crook, arrange[s] to utilize cars owned by other roads," *United States v. Allegheny-Ludlum Steel Corp., supra*, 406 U.S. at 745, 92 S.Ct. at 1945, it appropriates to itself incremental revenue which in fairness belongs to the car's owner.

The legislative history of the 1966 amendment to Section 1(14)(a) confirms that the "fit" of the amendment to the regulatory problem described in Part I is no coincidence and that the statutory inadequacy of

**36.** *See* note 6 *supra*. The language quoted in text was not changed by the 1976 amendments to § 1(14)(a). *See* Pub.L.No. 94–210, § 212(a), 90 Stat. 47 (1976).

**37.** At some point, however, more rapid return of cars could be achieved only by returning an excessive number of empty cars, which would be extremely inefficient. *See Hearings, supra* note 11, at 33 (statement of ICC Chairman Webb); note 17 *supra*.

**38.** *See Per Diem Report, supra* note 7, 332 ICC at 186. The 1976 amendment to § 1(14)(a) states the standard for setting basic per diem slightly differently, *viz.* "fair return on the cost of such type of freight car (giving due consideration to current costs of capital, repairs, materials, parts, and labor)." Pub.L.No. 94–210, § 212(a), 90 Stat. 47 (1976). This standard does not appear to differ in practical effect from the earlier standard as applied in the *Per Diem Report, supra*. In any case, at the present time, basic per diem rates continue at levels established with reference to the language of § 1(14)(a) adopted in 1966.

**39.** *See* note 56 *infra*.

**40.** *Hearings on H.R. 2230, H.R. 7165, and S. 1098 Before the House Committee on Interstate and Foreign Commerce*, 89th Cong., 1st Sess. 91 (1965) (testimony of general counsel for Burlington Lines).

supply requirement can best be understood as shorthand for congressional concern that IPD not be imposed except where the Commission has found that the disincentives associated with the national car-pool system have contributed to creation of an inadequate supply of a particular type of car. Indeed, the legislative history of the 1966 amendment shows rather clearly that in Congress' view the primary reason for the shortage which IPD was to correct was the widespread use of foreign cars, especially by eastern railroads. Thus to Senator Magnuson, sponsor in the Senate of the bill which became the 1966 amendment,

> [t]he shortage [which the amendment was intended to correct] results from the fact that many western roads build sufficient cars, but the trouble is that when the cars are on eastern roads, in the course of delivering goods to eastern markets, there is a reluctance on the part of some railroads in the East to return the cars
> * * * . * * *
>
> * * * * * *
>
> Some railroads find it more desirable to keep the boxcars and pay the $3 or $4 rental—at one time it was less than $2—than to buy boxcars. It is less costly to rent cars than to build them.

111 Cong.Rec. 15375 (1965). *See also* S.Rep. No.386, 89th Cong., 1st Sess. 3 (1965); S.Rep.No.452, 86th Cong., 1st Sess. 4–5 (1959). A similar understanding of the problem was echoed in the House. *See, e. g.,* 112 Cong.Rec. 10437 (1966) (remarks of Rep. Mize) ("when the per diem charge is low, as it is now, it is cheaper to rent a car than it is to buy or build one"); *id.* at 10438–10439 (remarks of Rep. Adams) ("[o]bviously it has been cheaper for many railroads to simply take the new cars produced by other railroads and hold them on their lines and pay a minimal rental rather than produce new cars"). *See also Hearings on H.R. 2230, H.R. 7165, and S. 1098 Before the House Committee on Interstate and Foreign Commerce,* 89th Cong., 1st Sess. 20, 30, 32–33, 39 (1965) (remarks of sponsors of legislation to amend § 1(14)(a)).

Notwithstanding the focus of the 1966 amendment, the Commission has chosen here to apply IPD to a type of freight car which has never been part of the national pool of free-running boxcars. Instead, use and return of XF cars had been governed until the order in this proceeding by Association of American Railroads Car Service Directive 155 [41] under which XF cars could

41. Car Service Directive 155 provides in relevant part:

NOTICE:

This Directive is issued under provisions of paragraph (g), Car Hire Rule 19. Each violation of Section A.2., or Section B.2. of this Directive is subject to an assessment of one hundred dollars ($100.00).

APPLICATION:

To box cars AAR mechanical designation XF, carrying railroad reporting marks.

ORDER:

SECTION A. Cars Assigned to Shipper or Pool Points.

1. Waybills accompanying assigned cars under load must be endorsed "Assigned Car For Processed Packaged Food Loading CSD No. 155."

2. After unloading, such cars must be returned empty to assigned loading point via reverse of loaded movement.

3. Such empty return must be on standard form waybills without charges which shall be endorsed "Assigned Car For Processed Packaged Food Loading CSD No. 155."

SECTION B. Unassigned Cars.

1. Waybills accompanying unassigned cars under load must be endorsed "Unassigned Car For Processed Packaged Food Loading CSD No. 155."

2. After unloading, cars subject to this Directive must be handled either per owner's instructions or returned empty to the owner or loaded to or via the owner, the holding road to exercise the option.

SECTION C.

XF cars are restricted to processed packaged food loading only except, with the approval of owner, such cars may be used for loading other noncontaminating products enclosed in clean packaging. Cars must not be used for the loading of bulk commodities. If cars are used for loading which results in contamination or damage to linings or floors, and it becomes necessary to renew floors, lining or sheathing (including any associated parts), or portions thereof, in order to restore cars to previous loading classification, the cost of

be, and apparently often were,[42] assigned to a single shipper for its individual and exclusive use.[43] Once assigned, XF cars could not be used by connecting lines for any purpose other than completion of a through haul unless the shipper-assignee directed the car to be loaded on the connecting line.[44] In all other cases, Directive 155 plainly required that "[a]fter unloading, such cars must be returned empty to [the] assigned loading point via reverse of load movement."[45] There is no evidence in the record that this particular car service di-

rective has been abused.[46] To the contrary, GMI commented that its assigned car program had been a success in part because of its ability in practice to direct the movements of each car assigned to it.[47] Moreover, the crux of the Commission's scarcity analysis is that roads without XF cars are supplying *XM* cars, not foreign XF cars, to food shippers.[48] Thus any shortages of XF cars cannot, on the record here, be attributed to roads using foreign XF cars to meet the needs of their shippers.[49] In addition, there is no evidence in the record to indi-

---

repairs shall be assumed by the road (either switching or road haul) placing cars for loading.

NOTE: Carriers may exempt their cars from the provisions of Section A.2. or B.2. to allow use by other specified lines for loading as prescribed in Section C. Such exemptions must be confirmed in writing to the Car Service Division in advance.

42. The record does not indicate how many XF cars have been placed in assigned service and how many in unassigned service. The comments of many parties indicating that assignment was critical to the effectiveness of the XF car as a food carrier would indicate that few if any XF cars ever operated in unassigned service. *See XF Report, supra* note 26, 350 ICC at 15. The Commission also states that XF cars are operated in assigned service and does not even mention the possibility that they might be free-running. *Id.* at 13.

43. Even if XF cars have been operated in unassigned service, Directive 155, § B(2), allows the owner of an XF car to specify how it will be moved after unloading. *See* note 41 *supra.* The only evidence in the record suggests that an owner's directions for further movement have generally been followed and that carriers and shippers have been cooperating to ensure proper car use. *See* comments of GMI, Exhibit 16, at 9, JA 53.

44. *See* Directive 155, § A(2), *supra* note 41. The "NOTE" to Directive 155 allows carriers to direct that their cars be loaded on foreign lines. *See* note 41 *supra.* Some roads have apparently made use of this provision to allow shipper-assignees to make loaded return movements. *See* comments of General Foods Corp., JA 146–147.

45. *See* note 41 *supra.*

46. Although Congress required the Commission to find that cars were in inadequate supply before IPD could be imposed, the finding of a car shortage does not itself indicate anything about the reasons for the shortage. And, while it is clear that Congress was legislating against an assumed state of facts in which car short-

ages could in some cases be ascribed to disincentives to car ownership caused by abuse of car service rules, the legislative history is quite plain that no one thought that car shortages necessarily implied an abuse of car service rules or that such an abuse was the sole cause of car shortages. The House report summarized the situation as follows:

There have been all sorts of conflicting statements made as to the reasons for the shortages as to whether they arise from lack of adequate ownership, or from improper distribution of the existing car fleet, or from overdetention by the shippers in unloading, or from the prevailing 5-day as against the 6-day week * * *.

\* \* \* \* \* \*

The record of the hearings which have been had on this bill is similar to the records which have been had on previous bills and is not conclusive as to whether "incentive" per diem will be successful in achieving the goal which we are seeking, namely, the alleviation of these chronic shortages.

Therefore, inasmuch as some railroads feel that this might be of great help to the situation and inasmuch as the Interstate Commerce Commission is of the belief that with this authorization it can do something in the matter and inasmuch as no alternative has been brought to the attention of the committee, the committee is recommending that this bill be enacted.

H.R.Rep.No.1183, 89th Cong., 1st Sess. 2–3 (1965), U.S.Code Cong. & Admin.News 1966, p. 2228. The Commission has also required proof of the existence of disincentives to car ownership arising from car service practices. *See* text at notes 59–60 *infra.*

47. *See* comments of GMI, Exhibit 16, at 9, JA 53.

48. *XF Report, supra* note 26, 350 ICC at 18.

49. Inadequacies in XF car supply may be attributable to low tariffs on processed food products. *See* comments on behalf of the Trustees of Penn Central Transportation Co., JA 92:

cate that XF cars are not returned promptly to their assigned points of origination. Again, the comments suggest that the reverse is true since the two shipper-assignees who made statements both indicated that their XF cars made more revenue trips per year than the national average for freight cars and neither mentioned any dissatisfaction with the achieved rate of XF utilization.[50]

The modification of Directive 155 required by the order here under review, *see XF Report, supra,* 350 ICC at 19, does not change the foregoing conclusions materially. The *XF Report* prohibits assignment of cars to a single shipper, but continues to allow assignment to a single location—which can presumably be a location on the owning railroad's line—for use in originating shipments on the owner's line. *See id.* Thus, for example, Grand Trunk Western Railroad now assigns all its cars to Battle Creek, Michigan, a location convenient to a number of its major food shippers,[51] and is apparently allowed to continue this practice under Directive 155 as modified.[52]

The record before us does not, therefore, support the conclusion that the disincentives to car ownership associated with the national boxcar pool have affected the supply of XF cars. This raises the question whether the broad language of the 1966

amendment nonetheless allows imposition of IPD on XF cars even though the existence of the core problem to which Congress addressed the 1966 amendment has not been established. I think it does not, although this conclusion is not free from difficulty given the blunderbuss nature of IPD [53] and the fact that imposition of IPD under the present regulations might result in more XF cars being built.[54]

Initially, it is important to note that there is no evidence that XF cars are being "appropriated" by non-owning lines for their own use or are being allowed to stand idle, and consequently IPD on XF cars is in essence a tax on the function of terminating through hauls. Although Congress clearly appreciated that IPD would accrue while this function was performed, the legislative history of the 1966 amendment to Section 1(14)(a) indicates that no assessment of IPD was to be made on the termination function except where this was incidental to the mechanics of imposing IPD on improper uses of foreign cars.

The Commission chairman testified before Congress that it was not the Commission's position that net per diem debtors should be taxed as such because at least some debtors would be short lines, or terminating or bridge roads, which ought proper-

---

Penn Central * * * has no present intention of acquiring or assigning *any additional* cars to the XF classification. The primary reason is that the present rate structure * * is wholly unsatisfactory from a net revenue standpoint. * * *

50. *See* comments of GMI, Exhibit 16, at 9, JA 53; comments of General Foods Corp., JA 146.

51. Comments of Grand Trunk Western Railroad, JA 6.

52. "[The amendments of Directive 155] will *preserve to the railroads full control of their cars.*" *XF Report, supra* note 26, 350 ICC at 19.

53. *See* note 17 *supra.*

54. This could occur in either of two ways. First, the earmarking requirements set out in 49 C.F.R. § 1036.3 (1976) will require any net IPD balances on XF cars to be used for new car construction, although not necessarily for construction of XF cars, *see id.* § 1036.4. Second, under § 1036.4, funds which are earmarked can be used to construct any of the types of cars to

which IPD applies. Thus it is conceivable that funds arising from XM car use could be applied to XF car construction (and vice versa). This use of funds raises problems, however. In *Incentive Per Diem Charges—1968, supra* note 26, the Commission stated:

[T]he main benefit from investing incentive per diem funds in an expanded covered hopper fleet would accrue to the grain shippers. This is contrary to the broader basis specified in section 1(14)(a) of the act for imposition of incentive per diem, namely consideration of "factors affecting the adequacy of the national freight car supply". Therefore, we believe that *incentive funds should only be used for purchase of plain boxcars, in order to benefit shippers generally and not a particular segment of the shipping public.*

349 ICC at 311 (emphasis added). How XF cars—which are restricted to food shippers, a class undoubtedly no larger than grain shippers—would "benefit shippers generally" if covered hoppers do not is by no means apparent.

ly to be using foreign cars to minimize inefficient unloaded car movements.[55] Not willing to take the chairman's word that the Commission would examine the effect of IPD on such lines and make exemptions where appropriate, the Senate Commerce Committee amended the Commission's proposed bill to require the Commission to consider the need to exempt "carriers \* \* \* owning an adequate number of freight cars to meet their responsibilities [and] carriers terminating a substantially higher percentage of interline traffic than they originate \* \* \* ," S.Rep.No.386, *supra*, at 2, 5, from IPD requirements. Although this language was removed by the House, *see* H.R.Rep. No.1183, 89th Cong., 1st Sess. 1 (1965), this deletion was not intended to work any substantive change in the factors the Commission was to consider. As explained by Senator Cotton during debate on the motion to concur in the House amendment:

> Under the Senate version of the bill, the ICC was specifically empowered to exempt from the incentive, or penalty, element of the freight car charges any or all of the groups [expressly enumerated in the Senate bill].
>
> The aim of these provisions of the Senate bill, which I had a part in suggesting, was to assure reasonable and fair consideration of the special problems arising in the industry, *including the problem of the terminating railroads, whose per diem charges are not related to the number of boxcars they may own.*
>
> In the bill before us today, as it has come back from the House of Representatives, the four types of circumstances spelled out in the Senate bill are not directly listed. *It is clear, however, that all the factors listed in the Senate bill still have to be considered by the \* \* Commission,* and the Commission would

have the power, and the duty, not to apply the incentive element to any group of carriers, and even a single carrier, where those four circumstances, or any other circumstances, made it in the national interest to do so.

112 Cong.Rec. 10756 (1966) (emphasis added). Senator Cotton's understanding of the effect of the House amendment seems clearly correct since the same view was taken by Representative Staggers, House floor manager for the bill:

> [T]he committee amendment provides that the Commission would be empowered in its discretion to exempt from the incentive element provisions any group of carriers where the Commission finds such exemption to be in the national interest. This provision enables the Commission to make exemptions from paying an incentive element by class of carrier, and permits the Commission to consider the several factors specifically authorized in the Senate bill.

112 Cong.Rec. 10435 (1966).

The conclusion that IPD was not to be applied except where there was some evidence that the breakdown of the national car-pool system had contributed to car shortages is further buttressed by a consideration of the meaning of the phrase "just and reasonable compensation" used in the 1966 amendment to describe IPD payments. The reason the Commission adopted IPD rather than a simple penalty to be paid to the United States appears to be that car owners were losing revenue in times of shortage because their cars were being "appropriated" by non-owners and because no foreign cars were available on the owners' lines to take the place of cars lost to non-owners.[56] The Senate too took the position

---

55. *See Hearings, supra* note 11, at 12, 14, 35.

56. The Commission's theory is nowhere spelled out with detail or clarity. In its Seventy-First Annual Report, in which promulgation of a rule under § 1(14)(a) was first endorsed, the Commission stated:

> The two principal causes of shortages are inadequate car ownership and the failure of some carriers to utilize existing equipment

efficiently. One way of correcting this unsatisfactory situation is the imposition of a penalty per diem charge [under § 1(15)] which would furnish a pecuniary spur to deficit railroads to acquire enough cars to meet their own loading obligations. Another approach to the problem \* \* \* is the requirement that the earning power or the value of the use of the vehicle which is lost by the owner when used or appropriated by

that the reason for giving compensation above basic per diem was "to provide just compensation to freight car owners by recognizing the value of the use of such equipment * * *." S.Rep.No.386, *supra*, at 4.

Inexplicably, Representative Staggers stated that the House amendment to the Senate bill rejected this concept of use value since it was "essentially * * * an approach to the problem through penalties rather than through incentives." 112 Cong. Rec. 10435 (1966). This statement notwithstanding, there is nothing in the legislative history of the House amendment which gives any other credible reason for compensating freight car owners for the use of their cars in time of shortage. This is especially so today when the Commission has set basic per diem rates in accord with the standards set out in Section 1(14)(a) so that the criticism often voiced in the House debate—that the basic per diem did not give a sufficient return on value to the owners of freight cars—can no longer be validly made.[57] Thus, while it is possible that the House meant to confer power on the Commission to increase the financial return to

---

other carriers, be included as a factor by the Commission in determining the per diem charge. This would eliminate the owner's loss, the user's gain, and provide an incentive for increased car ownership.

ICC, Seventy-First Annual Report 137 (1957). The language of the bill proposed by the Commission closely parallels this explanation, *see* S.Rep.No.386, 89th Cong., 1st Sess. 2 (1965), and ICC Chairman Webb appeared to endorse this explanation of the phrase "just and reasonable compensation" when he testified:

> [T]he bill [would] raise the per diem charge so as to *return* some profit to the owner of the car and thereby encourage an increase in car supply.

*Hearings, supra* note 11, at 35 (emphasis added). The "use value" or the profit to be "returned" would apparently be a value proportional to the net revenue which the non-owning user had gained through "appropriation" of a foreign car. An extended explanation of the function of per diem given by the general counsel of Burlington Lines, the major proponent of IPD, corroborates this view. *See generally Hearings, supra* note 11, at 140–142; *Hearings, supra* note 40, at 91. Presumably any level of per diem above basic per diem would provide incentives to chronic borrower roads to buy cars since, with ownership costs approximately equal to basic per diem, more net revenue would be returned if an owned car was used wherever possible. The opposite side of this proposition is that creditor roads would have financial incentives to invest more heavily in cars if the debtors did not increase their fleets since the total return to car ownership would be increased. In the XF proceeding, however, while owners of XF cars would undoubtedly enjoy increased returns, there is no evidence that XF debtors are making any revenue through appropriation of XF cars unless the word "appropriation" is tortured to apply to the period in which XF debtors are fulfilling their statutory obligation to terminate XF shipments. Thus the "use value" of which XF owners are deprived is zero, and the incentive per diem should similarly be zero.

57. House members were fond of repeating variants of the phrase "under present per diem rules, it is cheaper to rent a car than to own one." *See, e.g.*, pp. 22–23 *supra*, 567 F.2d at 76. This apparently referred to a belief that per diem rates were "barebones" rates which did not really cover the costs associated with freight car ownership. While this may or may not have been the case, it seems clear that no amendment to § 1(14)(a) was needed to authorize the Commission to establish reasonable, compensatory per diem rates. *Palmer v. United States, supra* note 15, is not to the contrary since that case treated the issue as whether the Commission had

> power to fix compensation for the use of cars as a regulatory measure, solely for the purpose of increasing efficiency in the use of cars and *at an amount wholly independent of the costs of car ownership, expenses of maintenance and operation, and a reasonable profit.*

75 F.Supp. at 66 (emphasis added). The issue of whether the increase was justifiable as compensation was not before the court. *Id.* at 76. Moreover, Rep. Staggers, in explaining the House amendment, which expressly defined basic per diem to include "a fair return on value," stated that this language was merely a restatement "in clear language of what the courts have held to be the limitations of the law as it is now written." 112 Cong.Rec. 10435 (1966). *See also Hearings, supra* note 40, at 52 (testimony of ICC Chairman Webb) ("Oh, we have that authority [to fix a compensatory per diem rate] at the present time, and we have always had it."). If the only purpose of the amendment was to force the Commission to set per diems to include a fair return on value, then the Commission has already done this, *see Per Diem Report, supra* note 7, at 211–214, and any additional increment of compensation for XF car owners would appear *a fortiori* to be excessive.

car owners without regard to whether non-owners were using foreign cars improperly, such a construction is unlikely since there is no express statement to this effect in either the House report or the debates on the House bill and since this construction would be inconsistent with the House's retention of the Senate's exemptions for roads which were net per diem debtors and yet which had the correct number of cars.[58]

Finally, the history of the 1976 amendment to Section 1(14)(a) also supports the view that IPD is proper only where railroads are using foreign boxcars in times of shortage. That amendment added a preamble to Section 1(14)(a) which reads: "It is the intent of Congress to encourage the purchase, acquisition, and efficient utilization of freight cars." Pub.L.No.94–210, 94th Cong., 2d Sess. § 212, 90 Stat. 46–47 (1976). While this language would support a very broad reading of the Commission's authority to impose IPD, the legislative history of this preamble discloses that the concern of Congress was to authorize and encourage a remedy for improper use of foreign freight cars: "The first change [the preamble] provides that the intent of Congress is to encourage ownership of cars *and discourage the use of cars not owned.*" H.R.Rep.No.725, 94th Cong., 1st Sess. 73 (1975) (emphasis added).

Further evidence that IPD cannot be imposed except as a corrective for disincentives to freight car ownership associated with the national car-pool system can be found in the Commission's interpretation of the shortage requirement in all other IPD proceedings.[59] The Commission's attempt to impose a system like IPD in 1947 was predicated on evidence that cars were not being properly returned to the lines of their owners. Car shortages, while providing the need to take corrective action, were incidental to the form of regulatory action proposed.[60] The first three Commission IPD reports after the 1966 amendment[61] focused almost exclusively on the question whether there was a nationwide shortage of XM boxcars. However, a contemporaneous Commission Report, *Investigation of Adequacy of Railroad Freight Car Ownership, Car Utilization, Distribution, Rules and Practices,* 335 ICC 264 (1969), demonstrated conclusively that the factors of poor utilization and non-owner use of XM cars existed, *see id.* at 294–295,[62] and accounts for the absence of any Commission discussion of this problem in the IPD reports.

In the first IPD report to discuss in detail the evidence needed to justify imposition of IPD, *Incentive Per Diem Charges—1968,* 349 ICC 303 (1975), issued only months before the XF car rules, the Commission declined to extend IPD to covered hopper cars, stating that the record did not meet the evidentiary standards for imposing IPD which it defined as follows:

> * * * [W]e are amenable to an expansion of the incentive per diem program to cars other than general service

---

58. *I. e.,* such roads, by virtue of being net per diem debtors, would routinely be using other roads' cars, thereby depriving them of revenue. If the purpose of IPD was simply to increase the return on car owners' investment, then no such exemption would be required and, indeed, such an exemption would be counterproductive.

59. "The construction of a statute by those charged with its execution" is an important factor to be considered in divining the meaning of a statute. *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). This is especially *so* here, where the legislation was proposed by the agency charged with its execution and where the legislative history indicates that Congress had no strong views on the efficacy of the approach suggested, but merely wanted to en-

sure that the *Palmer* case presented no barrier to Commission experimentation. *See* H.R.Rep. No.1183, *supra* note 46, at 2–3.

60. The Commission's initial proposal to amend § (15) also indicates that the Commission conceived of IPD as an adjunct to emergency powers intended to get cars moving more quickly in times of short-term emergency.

61. *Incentive Per Diem Charges,* 332 ICC 11 (1967); *Incentive Per Diem Charges—1968,* 337 ICC 183 (1969) (interim report); *id.,* 337 ICC 217 (1970) (further report).

62. The findings of this report were affirmed in *United States v. Allegheny-Ludlum Steel Corp., supra* note 3.

boxcars if (1) a record is made showing the car to be in short supply, (2) *a record is made showing a reluctance to expeditiously release the car by the terminating or delivering railroad * * *.*

*Id.* at 311 (emphasis added). This position was reiterated a few months after promulgation of the XF car rules in the Commission's notice of proposed rulemaking in *Incentive Per Diem Charges—Gondolas,* 40 Fed.Reg. 44851 (1975). There the Commission stated:

> The record should be developed to describe current utilization and distribution practices in order to examine the impact of these practices on gondola car supply. * * *

*Id.* at 44851.

In summary, with the conclusion of the XF proceeding the Commission has come completely about in its understanding of the uses to which IPD should be put. In 1947 IPD was envisioned as a short-term tool which was presented to the *Palmer* court as a device whose purpose was "wholly independent" of any notion of compensation for car owners.[63]  Between 1947 and 1966 short-term changed to long-term and the purely regulatory purpose was given overtones of compensation for use value. Today we are asked by the Commission to approve a use of IPD which cannot be said on the record before us to serve any of the regulatory purposes envisioned for IPD in either 1947, 1966, or 1976. With Section 1(14)(a) stripped of its regulatory heritage, however, it is simply not possible to assume that IPD will "contribute to sound car service practices" [64] and, further, the phrase "just and reasonable compensation" loses the only apparent meaning Congress ever intended it to have. Accordingly, I would

vacate the Commission's orders.[65]  *See* 5 U.S.C. §§ 706(2)(A), 706(2)(C) (1970). Moreover, even if my understanding of Section 1(14)(a) is mistaken, the Commission has at the very least departed without explanation from its contemporaneously announced standard of proof and for this reason as well should be reversed. *See Greyhound Corp. v. ICC,* 179 U.S.App.D.C. 228, 230, 231, 551 F.2d 414, 416–417 (1977).

## V.  CONCLUSION

Nobody wants rats or insects in their breakfast cereal, and if the choice here were between rats or financial hardship on Conrail, I would take a stand with the majority. But this is not the choice. For all that is shown on the record of this rulemaking, sanitation could be costlessly achieved simply by Commission promulgation of rules allowing clean XM cars to be retained in an assigned service free from the continual loading of contaminants. Yet the Commission seems oblivious to this possibility, even though its availability is strongly indicated by the record. Equally important, the Commission has not demonstrated that it has the authority to impose IPD on XF cars, although I believe it does have the authority to create an XF car fleet under other parts of the Interstate Commerce Act. Because of this, I would not allow the Commission to create a broad taxing power where it is clear that none was intended by Congress. Since the majority opinion does not require the Commission to take a hard look at the record and because the majority concurs in what is in my view an unsound reading of the incentive per diem amendments, I respectfully dissent.[66]

**63.** *See Palmer v. United States, supra* note 15, 75 F.Supp. at 66.

**64.** *See* notes 17 & 27 *supra.*

**65.** Commission counsel apparently does not disagree with the legislative history adumbrated above, since he explains that § 1(14)(a) is a response to shortages "largely attributable to the national car-pool system." ICC br. at 3. Nonetheless, counsel does not point to any evidence in the administrative record which would

indicate that the disincentives to ownership present in the car-pool system have affected the supply of XF cars.

**66.** In my judgment, the procedures adopted by the Commission in this proceeding are seriously deficient and contrary to both the hearing requirement of § 1(14)(a) of the Interstate Commerce Act and the common law of this circuit. The Commission's notice of proposed rulemaking failed to disclose the data upon which it was based and, when this material

was sought by Conrail, the Commission apparently refused to supply it. In addition, the Commission in unexplained haste refused to allow reply comments. With regard to the failure to disclose the information upon which the Commission's action was based, it is sufficient to note that the law of this circuit is well-settled: an agency has an obligation to disclose data underlying its positions to the public for scrutiny and comment. *See, e. g., Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 486 F.2d 375, 392–394 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 478 F.2d 615, 649 (1973). The issue of the necessity of reply comments is somewhat clouded. A three-judge District Court has taken the position that since reply comments are not expressly required by 5 U.S.C. § 553, there is no obligation on the Commission to allow them. *See Ann Arbor R. Co. v. United States, supra* note 3, 368 F.Supp. at 111. I disagree. In *United States v. Florida East Coast R. Co., supra* note 3, the Supreme Court held that the "hearing" requirement of § 1(14)(a) was not the adjudicatory hearing of 5 U.S.C. §§ 556–557. Nonetheless, the Court left open the possibility that the "hearing" requirement might call for supplementation of the procedures set out in § 553. *See* 410 U.S. at 238, 93 S.Ct. 810.

Certainly the commonsense notion of a hearing encompasses "a reasonable opportunity to know the claims of the opposing party *and to meet them * * *,*" *Morgan v. United States,* 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938) (emphasis added), whether those claims are made by the Commission, as in *Florida East Coast,* or primarily by private petitioners, as here. Especially on the issue of adequacy of supply, upon which Congress mandated a *finding,* something more than a "boxcars passing in the night" procedure would seem to be required.

I am not sure whether the procedural errors I perceive in this proceeding require reversal in the special circumstances of this case, since the parties have expressly waived all procedural objections and consequently have not focused on the actual harm which may have resulted from these deficiencies. However, I think the Commission should be aware that procedures in rulemaking are for the benefit of the public as well as the parties and accordingly cannot be shielded from appellate review by waiver. Therefore, should a proceeding marred with similar errors come before this court in the future, I would not be hesitant to reverse the Commission.